**Jesus Alfredo CORTEZ, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. C14–89–171–CR.**

Court of Appeals of Texas,
Houston (14th Dist.).

March 15, 1990.

Michael B. Charlton, Houston, for appellant.

Lester Blizzard, Houston, for appellee.

Before PAUL PRESSLER, CANNON and ELLIS, JJ.

## OPINION

ELLIS, Justice.

Appellant, Jesus Alfredo Cortez, appeals his judgment of conviction for the offense of possession with intent to deliver a controlled substance, namely, cocaine, weighing at least 400 grams by aggregate weight, including any adulterants and dilutants. TEX.REV.CIV.STAT.ANN. art. 4476–15, § 4.03(a) (Vernon Supp.1989). The Court found appellant guilty and assessed punishment at confinement for life in the Texas Department of Corrections and a $250,000 fine. We reverse and remand.

Appellant brings two points of error on appeal. In his first point of error, appellant submits the trial court erred in failing to suppress contraband seized by virtue of an involuntary consent to search. In his second point of error, appellant contends the evidence was insufficient to sustain his conviction.

At the Motion to Suppress Hearing, Officer Robert Hundersmarck of the Houston Police Department testified that in October of 1988 a confidential informant gave him information concerning a townhouse located at 12666 Newbrook in Houston. Hundersmarck characterized the informant as a "first time" informant, that is, Hundersmarck had not worked with the informant prior to the investigation underlying the instant case.

The informant related to Hundersmarck that drug transactions were being conducted at the Newbrook townhouse. Specifically, the informant described the method of delivery as follows: a customer would drive a car into the garage of the townhouse; the garage door would close; shortly thereafter the customer would exit the garage. When the car was out of sight inside the garage the cocaine would be loaded into the customer's car. The informant stated that cocaine was being sold in "multi-kilo" quantity and there were large sums of money inside the townhouse. The informant also described the participants as being Colombians, one in his twenties, approximately 5'10" and weighing 140 pounds with medium brown complexion; the other approximately 30 years old, 5'8" and weighing 160 pounds with a light brown complexion. The informant did not provide Hundersmarck with the names of the participants, although he did indicate to Hundersmarck that they were in the country illegally. The informant did not describe the cars that drove into the garage of the Newbrook townhouse nor did he reveal the time of day when the transactions occurred. While the informant told Hundersmarck that someone stayed at the townhouse occasionally, he did not describe that individual. Hundersmarck, himself, subsequently discovered that the utilities at 12666 Newbrook were registered in the name of a Fernando Arias.

On October 27, 1988, Hundersmarck and Officer Howze began their surveillance of the Newbrook townhouse. Hundersmarck testified that he observed a black Mercury Cougar being driven by appellant who matched one of the descriptions provided by the informant. Appellant parked the

Mercury Cougar in front of the townhouse, exited the car and entered the front door of the townhouse. Approximately one hour later, a second car, a black four-door passenger model with two occupants, drove up to the townhouse's garage where the car was admitted and the garage door was closed behind it. Ten minutes later, the same car emerged from the garage with its two occupants and drove off. Hundersmarck was unable to determine whether the black four-door passenger car contained any contraband.

Hundersmarck and Howze followed this car to its destination but they did not attempt to stop it because, as Hundersmarck testified "we were working up on the probable cause and we felt that we needed to continue our surveillance to verify a few more things ..." When they returned to the Newbrook townhouse, Hundersmarck and Howze noted that appellant's black Mercury Cougar was gone.

On October 28, 1988, Hundersmarck and Howze resumed their surveillance. Hundersmarck worked the back of the Newbrook townhouse where the garage was located; Howze worked the front where he could observe the front door of the townhouse. Howze and Hundersmarck communicated via radio. At approximately 4:00 p.m., Howze observed appellant drive up to the front of the Newbrook townhouse in the same black Mercury Cougar. On this occasion appellant was accompanied by a passenger, his co-defendant, Jorge Morales. Appellant and Morales entered through the front door of the townhouse. Hundersmarck then called for back-up assistance, namely, Sergeant McClellend and Patrol Officer Beedle. Shortly thereafter, appellant and Morales exited the townhouse. Howze radioed Hundersmarck that Morales was carrying a white Foot Locker bag which appeared to contain something. At that point, Hundersmarck testified they felt they had sufficient probable cause to make a stop. Hundersmarck had already decided that they were going to stop appellant's Mercury Cougar if the car left the Newbrook townhouse with any objects. In addition, Hundersmarck testified that they intended to stop the Mercury Cougar to ask

appellant to sign a consent to search the Newbrook address.

Hundersmarck, Howze, McClellend, and Patrolman Beedle followed appellant in their respective cars. At approximately 5:20 p.m., all four policemen stopped the car in the parking lot of an apartment complex on Beechnut. The stop was effected by a siren and flashing red lights. All four officers approached appellant and Morales who both spontaneously put their hands up on the dashboard of the Mercury Cougar. Beedle, who apparently could speak a little Spanish, then asked and motioned to appellant and Morales to step away from the Mercury Cougar. Appellant and Morales did not speak English. Sergeant McClellend approached the Mercury Cougar on the passenger side where he observed a white Foot Locker bag. McClellend also noticed that the Foot Locker bag was partially open. Hundersmarck determined that the bag contained cocaine. Hundersmarck then called for a Spanish speaking officer.

Officer Rivera arrived on the scene within 15 to 20 minutes. During the interval, appellant and Morales were handcuffed and placed in separate cars. When the Spanish speaking Officer Rivera arrived, he testified that he read in Spanish the *Miranda* warnings and then explained the voluntary consent to search form to appellant. He stated that he told appellant he had a right not to consent to the search and could refuse. Rivera did not tell appellant the townhouse would be searched if appellant refused to give his consent to search. Rivera testified he told appellant the townhouse would be completely searched if appellant signed the consent form and that the police would be authorized to take anything they wanted from the townhouse. Rivera testified that no threats or promises were made nor was anything offered in exchange for appellant's consent. Rivera stated that the police released appellant from his handcuffs in order for him to sign the consent form. Appellant signed the consent form within fifteen to twenty minutes of the original stop.

The police obtained a set of keys from appellant and returned to the Newbrook townhouse to conduct their search which revealed the following: 18 kilos of cocaine found underneath the sink in the downstairs bathroom; an empty kilo wrapper with Morales' fingerprints found among the 18 kilos of cocaine; $2,400 dollars in cash found in a suitcase underneath the stairwell; $1,123 dollars in cash, as well as money ledgers used to record sales, photographs of appellant and his medical prescriptions, all found in the master bedroom.

The trial court granted appellant's Motion to Suppress as to the evidence found in the search of the Mercury Cougar, but denied his Motion to Suppress as to the evidence found in the search of the townhouse.

In his first point of error, appellant submits the trial court erred in failing to suppress contraband seized by virtue of an involuntary consent to search.

At the pre-trial hearing on the Motion to Suppress, the trial court found that appellant's and his co-defendant's arrest on October 28, 1988 was illegal. It is generally necessary that all evidence obtained "as a direct result" of the illegal detention and arrest be suppressed under the exclusionary rule of the Fourth Amendment. *Wong Sun v. United States,* 371 U.S. 471 at 485, 83 S.Ct. 407 at 416, 9 L.Ed.2d 441 (1963); *Bell v. State,* 724 S.W.2d 780 (Tex.Crim. App.1986). The issue now is: was the connection between appellant's illegal arrest and his consent to search the Newbrook townhouse sufficiently attenuated from the primary taint of his illegal arrest to permit the items seized from it to be used at trial to acquire a conviction? *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975).

In *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) the U.S. Supreme Court further held that a consent to search may be tainted by an illegal arrest even if voluntarily given and that the State must prove that the consent was independent of the illegal arrest. *Id* 103 S.Ct. at 1326. In *Boyle v. State,* No. 69,743 (Tex.Crim.App. October 4, 1989) the Court of Criminal Appeals considered the factors which that Court has tailored for evaluating situations involving a consensual search following an unconstitutional detention.

The first factor considered by the *Boyle* majority was whether the appellant was made fully aware of the fact that he could decline to consent to the search. When Spanish speaking Officer Rivera arrived on the scene he told appellant he had a right not to consent to the search of the townhouse and could refuse. Thus, this factor must be resolved in favor of the State.

The second factor examined in *Boyle* was the temporal proximity of appellant's consensual search to his illegal arrest. In *Boyle,* the defendant was arrested at about 6:00 p.m. on October 17, 1985, and placed in jail. He gave his consent to search the following morning at 7:15 a.m. The Court in *Boyle* emphasized that the State did not demonstrate that during the twelve hour time interval the defendant was able to confer with an attorney or that he was reinformed of his right to refuse to consent to the search, thus allowing him time to collect his thoughts. In the instant case, the time interval between appellant's illegal arrest and the consent to search was fifteen to twenty minutes as opposed to twelve hours in *Boyle.* Moreover, appellant in the instant case did not speak English. Like *Boyle,* not only did appellant in the instant case not have the opportunity to consult legal counsel, appellant could not even confer with the only individual fluent in appellant's language, namely, Morales, as both men were placed in separate police cars during the time interval. Appellant was also handcuffed during this interval. Spanish speaking Officer Rivera did give appellant his *Miranda* warnings. Merely giving *Miranda* warnings, while a factor in confession cases, is not a sufficient intervening circumstance to attenuate the illegal arrest. *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). Clearly, then, it is not sufficient in the consent case now before us. We find no event in this record, other than the giving of the *Mi-*

*randa* warnings and the reading to appellant of his right to refuse the consent to search, to indicate sufficient intervening circumstances.

The third factor considered by *Boyle* is whether the illegal arrest brought about exposure of the particular object which the police sought consent to search. After he was arrested in the parking lot of the Beechnut apartment complex, appellant gave his consent to search the townhouse. As a result of arresting appellant, the police obtained the consensual search and retrieved the incriminating evidence which they had hoped to detect. Hundersmarck testified that a primary purpose in stopping the Mercury Cougar was to ask appellant to sign the consent to search the Newbrook address. Under cross-examination at the pre-trial Motion to Suppress hearing, Hundersmarck provided a detailed narrative of his reasons for the stop:

> ... I mean, the primary, if you want to know why I stopped it was to check that Foot Locker bag *and to ask them for a consent on that house* and then there was other reasons that I could have stopped them, for any number of reasons, okay. One, that they were illegal aliens and they had a minor traffic, they were seen making a minor traffic violation. But the primary cause, you know, you can take the other ones away, the reason I stopped them was to question them, find out what was in the Foot Locker bag because I believed from my police experience and knowledge that was contraband, I felt that it was and *I believed that from my information received from my informant. And the things I had seen on surveillance, that I had a good reason to stop that vehicle and at least ask them for a consent to search that house.* (emphasis added).

The trial court concluded that Hundersmarck had no valid reason to stop appellant's car. Clearly, the illegal detention of appellant "... brought about [the] police observation of the particular object which they sought consent to search ..." *Brick v. State*, 738 S.W.2d 676, 680 (Tex.Crim. App.1987) quoting from 3 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment (2d ed. 1987), § 8.2(d) at 193–94. We re-emphasize Hundersmarck's own testimony that "... *I believed that from my information received from my informant. And the things I had seen on surveillance, that I had a good reason to stop that vehicle and at least ask them for a consent to search that house.*" Hundersmarck's informant had confided that cocaine was being sold in multi-kilo quantity at the Newbrook townhouse. Thus Hundersmarck observed exactly that for which he asked appellant's consent to search the townhouse. This factor militates against the attenuation of the taint of the illegal arrest.

The fourth factor treated by *Boyle* was whether the police purpose underlying the illegality was to obtain the consent. The record establishes that one of the prime purposes motivating appellant's illegal arrest was to obtain the consensual search of the townhouse. On the first day of surveillance which was October 27, Hundersmarck was unable to determine whether the black four-door passenger car which had been admitted into the townhouse's garage for a ten minute period before exiting contained any contraband. We re-iterate Hundersmarck's own testimony as to why he stopped appellant's Mercury Cougar: "... I mean, the primary, if you want to know why I stopped it was to check that Foot Locker bag *and to ask them for a consent on that house.*" We conclude the means used to realize Hundersmarck's goal of gaining access to the Newbrook townhouse was the illegal arrest of appellant and his co-defendant in the Mercury Cougar. Spanish speaking Officer Rivera testified Hundersmarck instructed him to read appellant his *Miranda* warnings and then to explain the voluntary consent to search form and ask appellant to sign it. Clearly, this whole episode demonstrates that the purpose underlying the illegal arrest was to procure the consent to search the Newbrook address.

■ The fifth factor treated by the court in *Boyle* was the "flagrancy of police misconduct." In *Boyle*, the dispositive standard for this evaluation went to the "quality of purposefulness" characterizing the

illegality. *Id.* at 21. In the instant case the record establishes conclusively the lack of probable cause. Hundersmarck conceded he had received no information whatsoever from his first time informant that drugs would be transported from the townhouse through the front door in a Foot Locker bag. Further, Hundersmarck admitted that appellant's conduct on October 28th was just as consistent with innocent conduct as guilty and that he had no idea what was in the Foot Locker bag before he stopped appellant's car. Yet Hundersmarck testified that a primary purpose for appellant's arrest was to find out what was in the Foot Locker bag and at least ask for a consent to search the townhouse. We are also mindful that Hundersmarck testified that he would have used any means or justification to stop appellant's car and secure the consent. Hundersmarck actually testified the police had already determined that they were going to have appellant's vehicle stopped if it left the townhouse with *any* objects. We note finally that Hundersmarck testified on re-direct examination that he stopped appellant for the "main reasons" but if the prosecutor was looking for a reason, Hundersmarck had several as follows:

Q: Traffic signal or not, speeding or not—

A: *I don't care what they were doing.*

Q: —were you going to let that car go away with what you thought was contraband?

A: *No. They were going to get stopped.*

We find the record reveals that Hundersmarck's purpose in stopping appellant was an obvious investigatory ploy clearly calculated to gain access to the interior of the Newbrook townhouse by means of the so-called voluntary consent to search form.

Finally, although not addressed directly and with particularity in *Boyle's* evaluation of factors militating against consensual searches following an illegal detention, we note that the consent to search was not volunteered by appellant. On the contrary, Hundersmarck instructed Officer Rivera to ask appellant to sign the consent to search form. Since the State concedes that appellant's consent was requested rather than volunteered, this factor which is considered significant in determining whether the consent was voluntarily rendered, must be resolved in favor of appellant. See *Brick v. State*, 738 S.W.2d at 681 quoting 3 W. LaFave, *supra*, at 193–194.

■ Our consideration of *Boyle's* factors, in addition to our concern over the undisputed fact that the police took affirmative steps to request appellant's consent, compels us to find that appellant's consent to search the Newbrook townhouse was not sufficiently attenuated from the taint of his illegal arrest. We sustain appellant's first point of error and reverse and remand the case for a new trial.

■ In his second point of error, appellant contends the evidence is insufficient to sustain his conviction. When trial error occurs such as the erroneous admission of evidence as in the case before us, the proper remedy is to reverse and remand the cause for a new trial. *Adams v. State*, 639 S.W.2d 942, 943 (Tex.Crim.App.1982) (per curiam). However, the erroneously admitted evidence should not be discounted in considering the sufficiency of the evidence because this would allow the appellant to "bootstrap himself into an acquittal ..." *Collins v. State*, 602 S.W.2d 537, 539 (Tex. Crim.App.1980); *see also Lucas v. State*, 721 S.W.2d 315, 318 (Tex.Crim.App.1986). When confronted with a challenge to the sufficiency of the evidence, an appellate court must determine whether, viewing the evidence in the light most favorable to the verdict, a rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

■ In order to establish unlawful possession of a controlled substance, the State must prove two elements: (1) that the accused exercised care, control, and management over the contraband, and (2) that the accused knew the matter possessed was contraband. *Cude v. State*, 716 S.W.2d 46, 47 (Tex.Crim.App.1986); *Rhyne*

*v. State*, 620 S.W.2d 599, 601 (Tex.Crim. App.1981). Possession means more than being where the action is; it involves exercise of dominion and control over the thing actually possessed. *McGoldrick v. State*, 682 S.W.2d 573, 578 (Tex.Crim.App.1985). However, possession of contraband need not be exclusive and evidence which shows that the accused jointly possessed the contraband with another is sufficient. *Woods v. State*, 533 S.W.2d 16 (Tex.Crim.App. 1976).

██ The undercover surveillance by Hundersmarck and Howze revealed appellant had access to the townhouse through the front door on two consecutive days. Appellant was present on October 27, 1988 when the precise *modus operandi* of a drug buy, as described by the confidential informant, was effected. Only two hours before the alleged drug buy, appellant had entered through the front door of the townhouse, apparently with the use of the house key which he eventually provided to the police on October 28, 1988. On October 28, 1988, appellant was again seen entering the front door of the townhouse in the company of his co-defendant, Jorge Morales. Thirty minutes later both men were seen exiting the front door of the townhouse. With the 18 kilos of cocaine subsequently found underneath the sink in the downstairs bathroom was an empty kilo wrapper with Morales' fingerprints.

In their search of the Newbrook townhouse, the police found in the master bedroom photographs of appellant, prescription medications belonging to appellant, personal papers with appellant's name on them, $1,123.00 in cash, money ledgers recording drug transactions and men's clothing. Clearly, the cocaine, located as it was in the downstairs powder-room, was in close proximity to the master bedroom occupied by appellant and was readily accessible to him. In addition, the amount of cocaine found, namely, 18 kilos, is large enough, under the circumstance of this case, to indicate appellant knew of its presence. Hundersmarck testified appellant fit the general description of suspects provided to Hundersmarck by his confidential informant. In the kitchen of the townhouse, in addition to finding food in the refrigerator, Hundersmarck found a Triple Beam scale and large clear Ziplock bags in a closed kitchen cabinet. Further, the consent to search form signed by appellant reads in relevant part:

*I, Jesus Alfredo Cortez, having been informed of my constitutional right not to have a search made of the premises hereinafter mentioned without a search warrant and of my right to refuse to consent to a search, hereby authorize R.A. Hundersmarck and J.H. Howze, Policemen of the Houston Police Department, to conduct a complete search of* my residence *located at 12666 Newbrook.* (emphasis added).

Consistent with our duty to review the evidence in the light most favorable to the verdict, we conclude there is sufficient evidence to show that appellant both exercised actual care, custody, control or management over the contraband and also that appellant knew the matter was contraband. Appellant's point of error two is overruled.

Accordingly we reverse and remand the judgment of the trial court.