**Juan Jose ROSALEZ, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 05–92–01547–CR.**

Court of Appeals of Texas, Dallas.

Dec. 23, 1993.

Rehearing Denied Feb. 25, 1994.

G. Rudolph Garza, Jr., Corpus Christi, for appellant.

Bruce A. Strange, Kaufman, for appellee.

Before KINKEADE, BURNETT and MORRIS, JJ.

## OPINION

MORRIS, Justice.

Involved here are the competing interests of citizens desiring privacy at home and the need of the police to be effective in preventing crime. At issue are the consequences of the police entering an owner's property without his consent to investigate suspected burglars but, after finding no burglary, arresting instead the property owner for possession of marijuana. We conclude based on the facts shown, the conviction of the property owner should be upheld. We do so even though we also conclude the police first arrested the owner without probable cause.

### FACTUAL BACKGROUND

After his indictment for possession of marijuana, Juan Jose Rosalez sought to suppress under both the federal and Texas exclusionary rules all evidence obtained as a result of his arrest and the search of his house. As grounds for excluding the evidence, appellant asserted that two Kaufman County sheriff's deputies criminally trespassed on his proper-

ty and then arrested him without a warrant or probable cause. Appellant contended the deputies' conduct violated the Fourth and Fifth Amendments to the federal constitution; article I, section 9 of the Texas Constitution; and section 30.05 of the Texas Penal Code. He also contended his consent to search his house after his arrest was not freely and intelligently given and was tainted by the illegality of his arrest. The trial court held an evidentiary hearing on appellant's motion to suppress.

At the hearing, Sherry Caldwell, a resident of Kaufman County, testified first. Caldwell stated she was driving down Farm to Market Road 2727 in rural Kaufman County with her son and husband on November 18, 1991. As she approached a residence near where she lived, she saw three or four men standing next to the road at the driveway entrance to the residence. The house on the property was set back a considerable distance from the road in a heavily wooded area. Caldwell saw a "No Trespassing" sign on the gate across the entrance to the residence. As she drove by, a couple of the men walked toward the gate. Caldwell turned her car around and drove past the residence again. As she did so the men walked back toward the road. Because she thought it was suspicious for the men to be standing near the gate with no car around, Caldwell drove to a nearby business and telephoned the Kaufman County Sheriff's Department. Caldwell told the sheriff's department dispatcher that there were "four suspicious black gentlemen out by the road" who had walked toward the gate to the residence as she drove past. She apparently also told the dispatcher there were "a lot of burglaries in that area."

Lieutenant Walter Hughey of the Kaufman County Sheriff's Department testified next. Hughey said he and Deputy Kenneth Garvin were dispatched in separate vehicles to a "suspicious persons" call at approximately 9:45 a.m. on November 18, 1991. The dispatch advised him there were four black males standing next to the road by the en-

trance to a residence on Farm to Market Road 2727.

When he arrived at the entrance to the residence, Hughey saw no one. Hughey testified he was aware a man named Rosalez owned the property, but he did not know Rosalez personally and would not have recognized him if he saw him. As Hughey and Garvin checked the property along the road, Hughey was approached by a man who asked if Hughey had received a report concerning three or four black males.[1] The man related the same information Hughey had received in the dispatch. In addition, he told Hughey the men had jumped over the gate or fence and were walking down the driveway toward the house when he last saw them. Hughey opened the unlocked gate, and he and Garvin drove onto the property.

The trial court admitted into evidence several aerial and ground photographs of appellant's property. These photographs show the property is heavily wooded and consists of a number of acres. A long driveway connects appellant's residence to Farm to Market Road 2727. The driveway forks about two-thirds of the distance between the road and the house on the property. The right fork of the driveway leads to a carport that is attached to appellant's house. The left fork goes around the side of the house but is a considerable distance from it.

After passing through the gate, Hughey and Garvin drove approximately seventy-five yards up the driveway. They stopped near the front yard of the house. Hughey saw three or four black males standing in the front yard between the fork in the driveway. The men had lumber laid out on the ground and appeared to be doing some type of work. From the description given in the dispatch, Hughey concluded the men were "the subjects that were in question," but he did not observe them violating any law. Hughey approached the men and asked if the owner of the property was there. He apparently received a response from one of the men, but he did not state what the man told him. After talking with the men, Hughey was still

---

1. Hughey testified he could not recall the name of the man who approached him. There was no other evidence adduced at the hearing regarding the identity of this individual. Appellant suggested in his brief and at oral argument that the man was Sherry Caldwell's husband.

not satisfied that there was no criminal activity afoot. Hughey then saw appellant for the first time when appellant walked out of a building located approximately fifty yards away. A photograph admitted into evidence as Defendant's Exhibit 2 shows the building identified by Hughey. The building is located near the left fork of the driveway, a considerable distance from appellant's house.

When Hughey saw him, appellant was carrying a white box and walking in a direction away from Hughey. As Hughey began walking toward him, appellant looked back at Hughey and began running away. Hughey still did not know who appellant was. Hughey called out for appellant to stop, but he did not do so. Hughey and Garvin pursued him. Hughey said he did not have his gun drawn while chasing appellant. As appellant was running, Hughey saw him throw the white box he was carrying. Hughey stated he "caught" appellant and "secured" him with handcuffs. According to Hughey, appellant was not under arrest when he was handcuffed but was merely being "detained." Hughey admitted, however, that appellant was not free to leave.

Hughey retrieved the white box from the roof of a small barn where appellant had thrown it and discovered it contained a large amount of marijuana. Hughey identified the barn roof in a photograph admitted as Defendant's Exhibit 4. The barn is located a significant distance behind both appellant's house and the building from which appellant exited when Hughey first saw him. Hughey administered *Miranda* warnings to appellant after discovering the marijuana in the white box. Hughey said appellant indicated in English that he understood his *Miranda* rights. He stated appellant did not ask for an attorney.

Hughey admitted that prior to entering the premises no specific crime was reported to him. Neither he nor Garvin had a search warrant to enter appellant's property. Hughey said he entered appellant's property because suspicious persons were reported to be in the area and he could not determine from outside the gate if the residence was "okay." Hughey said he knew appellant's property was in a high crime area and that

he had been dispatched to the area to investigate burglaries more than eight times over the prior three or four years. He suggested this knowledge, together with the information he received in the dispatch and from the man who approached him outside the property, caused him to believe there might have been a burglary at the residence. Hughey also thought appellant's action in walking out of the building carrying a box was suspicious. This suspicion, coupled with the fact he did not know the owner of the property, led him to believe criminal activity was taking place. Hughey testified, however, that no crime had been committed in his presence at the point he handcuffed appellant.

One of the men working on appellant's property that morning, James Fields, Jr., also testified at the hearing. He confirmed there was a "No Trespassing" sign posted on the gate. He said he saw Hughey and Garvin pursue appellant with their guns drawn. According to Fields, appellant and Hughey ran around the corner of a building; he then could not see what was happening. He heard Hughey tell appellant to "get down" and appellant say, "Okay, wait a minute, don't hit me no more, I'm getting down." Fields admitted he did not see Hughey hit appellant.

Following his arrest, appellant was taken to the Kaufman County Law Enforcement Center where he was interviewed by George Pelphrey, a criminal investigator for the sheriff's department. Pelphrey explained to appellant that the sheriff's department wanted to search his house and all the outbuildings on the premises. Pelphrey did not suggest to appellant that a search warrant would be obtained for the premises regardless of whether he signed the consent form. Pelphrey asked appellant to sign the consent form but told him he did not have to sign it and could refuse to do so. Appellant agreed to sign the form and did so. Pelphrey said appellant did not appear apprehensive when he signed the form. Pelphrey stated appellant had been in custody approximately two hours and was handcuffed and under arrest when he signed the form. He stated it was "jail procedure" to handcuff an inmate when he was brought from the jail facility to a

conference room. Pelphrey did not speak Spanish, but he was aware appellant was a "predominantly Spanish-speaking person." According to Pelphrey, he and appellant spoke to each other in English and had no trouble communicating. Appellant never told Pelphrey he was unable to understand what Pelphrey was saying to him or asking him. After obtaining appellant's consent, the sheriff's department conducted a search of the premises and found an additional amount of marijuana in appellant's house.

The trial court denied appellant's motion to suppress evidence. Appellant entered a plea of nolo contendere pursuant to a plea bargain agreement. At the hearing on appellant's plea of nolo contendere, the State reintroduced the testimony adduced at the suppression hearing. The State and defense counsel also stipulated that 16.11 pounds of marijuana were seized from appellant's property. The trial court found appellant guilty and assessed punishment at ten years' confinement and a five thousand dollar fine. Appellant asserts three points of error on appeal. He complains the trial court reversibly erred in overruling his pretrial motion to suppress evidence.

### DISCUSSION

 A trial court's ruling on a motion to suppress evidence will not be disturbed absent a showing it abused its discretion. *See Maddox v. State*, 682 S.W.2d 563, 564 (Tex. Crim.App.1985). In reviewing the trial court's decision, an appellate court does not engage in its own factual review; it determines only whether the record supports the trial court's ruling and whether the trial court improperly applied the law to the facts. *See Romero v. State*, 800 S.W.2d 539, 543 (Tex.Crim.App.1990); *Segura v. State*, 826 S.W.2d 178, 181 (Tex.App.—Dallas 1992, pet. ref'd). On appeal, the evidence adduced at the suppression hearing is viewed in the light most favorable to the trial court's ruling, keeping in mind the trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *See*

*Daniels v. State*, 718 S.W.2d 702, 704 (Tex. Crim.App.), *cert. denied*, 479 U.S. 885, 107 S.Ct. 277, 93 L.Ed.2d 252 (1986), *overruled on other grounds, Juarez v. State*, 758 S.W.2d 772, 780 n. 3 (Tex.Crim.App.1988); *Segura*, 826 S.W.2d at 181. We must uphold the trial court's ruling if it can be upheld on any valid theory, regardless of whether the State argued it in the trial court or on appeal. *See Lewis v. State*, 664 S.W.2d 345, 347 (Tex.Crim.App.1984).

Rather than address appellant's points of error in the numerical order in which they have been raised, we address them chronologically as they relate to (1) the deputies' warrantless entry onto appellant's property, (2) appellant's warrantless arrest, and (3) appellant's subsequent consent to search his property.

### *The Warrantless Entry*

In his first point of error, appellant contends the trial court reversibly erred in denying his motion to suppress because the marijuana seized on his property was obtained as a result of Hughey and Garvin's "warrantless intrusion" onto the property. Although appellant complains of the deputies' warrantless *entry* onto his property, he devotes almost his entire argument under this point of error to challenging his warrantless *arrest*. To the extent this point of error challenges the deputies' warrantless entry onto his property, we address it now. As the point of error relates to appellant's warrantless arrest, we consider it in the next section of this opinion.

 Appellant seems to argue that Hughey and Garvin should have obtained a search warrant before entering his property because their entry constituted a "search" under the Fourth Amendment.[2] Appellant contends his residence and its surrounding curtilage are protected under the Fourth Amendment from unreasonable searches. Although it is not clear from his brief, appellant appears to argue that his entire proper-

---

**2.** The State concedes in its brief that the deputies' warrantless entry onto appellant's property was a "search" under the Fourth Amendment. We are not bound, however, by the State's concession on questions of fact or law that are unsupported by the record. *See Meshell v. State*, 739 S.W.2d 246, 250 n. 4 (Tex.Crim.App.1987).

ty, which is of considerable acreage, is within the curtilage of his home. Appellant claims that no part of his property can be considered an "open field" because the property is wooded and completely fenced, cannot be seen from the road, and is posted with a "No Trespassing" sign. We agree that appellant has a legitimate expectation of privacy in his home and its curtilage. But we do not accept appellant's argument that the several acres comprising his entire property are within the curtilage of his home and therefore are entitled to fourth amendment protection.

■ The term "curtilage" is defined as "the area around the home to which the activity of home life extends." *Oliver v. United States,* 466 U.S. 170, 182 n. 12, 104 S.Ct. 1735, 1748 n. 12, 80 L.Ed.2d 214 (1984). The curtilage is entitled to the same fourth amendment protection from unreasonable searches that is afforded the home itself. *See id.* at 180, 104 S.Ct. at 1742. An "open field" on the other hand may include "any unoccupied or undeveloped area outside of the curtilage." *Id.* n. 11. Because no reasonable expectation of privacy attaches to an open field, no fourth amendment protection extends to such an area. *See id.* at 180–81, 104 S.Ct. at 1742–43. Consequently, the government's intrusion upon an open field "is not one of those 'unreasonable searches' proscribed by the text of the Fourth Amendment." *Id.* at 177, 104 S.Ct. at 1740. Law enforcement officers may enter and search an open field without a warrant. *See id.* at 173, 104 S.Ct. at 1738.

■ To resolve the question of whether a particular area constitutes an open field or is included within the curtilage of a home, we examine the following factors: (1) the proximity to the home of the area claimed to be the curtilage, (2) whether the area is included within an enclosure surrounding the home, (3) the nature of the uses to which the area is put, and (4) the steps taken by the resident to protect the area from observation by people passing by. *See United States v. Dunn,* 480 U.S. 294, 301, 107 S.Ct. 1134, 1139, 94 L.Ed.2d 326 (1987). These factors do not constitute a finely tuned formula that will yield a correct answer to all "extent-of-curti-

lage" questions. Rather, they are analytical tools useful only to the degree they bear upon the central question of whether the particular area at issue "is so intimately tied to the home itself" that it should be placed under the home's umbrella of fourth amendment protection. *Id.*

■ Here, the aerial and ground photographs of appellant's property, when coupled with Hughey's testimony regarding the extent of the deputies' entry upon the property, lead us to the conclusion that the areas upon which Hughey and Garvin intruded lay outside the curtilage of appellant's house. First, the fork in the driveway where the deputies initially encountered and questioned the four men is located a considerable distance from appellant's house and the area immediately surrounding it. The deputies' activities were not centered around appellant's house but away from it near the building from which appellant exited and the small barn upon which he discarded the box containing marijuana. Both the building and the small barn are located some distance from appellant's house. The significant distance between appellant's house and the areas in question do not support a conclusion that these areas should be treated as an adjunct of appellant's house. *See id.* at 302, 107 S.Ct. at 1140. Second, although the perimeter of appellant's property appears to be fenced completely, the particular areas in question are not included within a separate enclosure surrounding the home; as such these areas cannot be said to be "readily identifiable as part and parcel of the house." *Id.* Third, it is clear from the photographs in the record that the areas in question were not of such proximity to appellant's house that they could be fairly said to have been used for or associated with "intimate activities of the home." *Id.* Finally, appellant took minimal steps to protect these areas from observation by people passing by. As noted, there were no interior fences on the property. The perimeter fence was a typical ranch fence consisting of barbed wire, steel cable, and steel posts. It is obvious the fence was not constructed for the purpose of preventing persons from observing what lay in the area it enclosed. *See id.* at 303, 107 S.Ct. at 1140.

■ While appellant's decision to erect a perimeter fence and post a "No Trespassing" sign on the gate may indicate he held a subjective expectation of privacy with respect to the entire property, it does not create an expectation of privacy that society recognizes as legitimate and reasonable. *See Oliver*, 466 U.S. at 182, 104 S.Ct. at 1743. One cannot create a legitimate expectation of privacy in an open field or expand the curtilage of his home to include an open field by erecting fences, gates, and "No Trespassing" signs around it. *See Hurwitz v. State*, 673 S.W.2d 347, 349–50 (Tex.App.—Austin 1984), *aff'd on other grounds*, 700 S.W.2d 919 (Tex. Crim.App.1985), *cert. denied*, 474 U.S. 1102, 106 S.Ct. 884, 88 L.Ed.2d 919 (1986). Likewise, the fact appellant's property was heavily wooded and could not be fully viewed from the road does not support a conclusion that none of the property constituted an open field as defined by law. An "open field" need not be "open" or a "field" as those terms are commonly used; a fenced, thickly wooded area may be an open field for purposes of fourth amendment analysis. *See Oliver*, 466 U.S. at 180 n. 11, 104 S.Ct. at 1747 n. 11; *Hurwitz*, 673 S.W.2d at 349.

Because we conclude the areas upon which the deputies intruded were not within the curtilage of appellant's home, no constitutional protection extended to these areas. As such, the deputies' actions did not amount to a "search" under the Fourth Amendment, and it was not necessary for them to obtain a search warrant before entering appellant's property. To the extent appellant's first point of error complains of the deputies' failure to obtain a search warrant, it is overruled.

In his second point of error, appellant contends the trial court reversibly erred in overruling his pretrial motion to suppress evidence because Hughey and Garvin's warrantless entry on his property constituted a criminal trespass under section 30.05 of the Texas Penal Code. Because the deputies obtained the marijuana from his premises as a result of this criminal trespass, appellant argues the marijuana was obtained in violation of the laws of this State and evidence of it should have been suppressed under article 38.23 of the Texas Code of Criminal Procedure.[3] In response, the State admits that "technically the officers did trespass on [appellant's] property." The State contends, however, the deputies were justified in entering the property to prevent what they thought might be a burglary in progress. The State also argues that to apply section 30.05 to peace officers to prevent them from entering a person's property in emergency situations would conflict with the officers' statutory duty to suppress crime and prevent offenses against property.[4] Finally, the State asserts article 38.23 should not be applied to suppress the evidence in this case because its purpose in deterring illegal evidence-gathering by law enforcement officers is not served in a situation where, as here, law enforcement officers enter a person's property for the legitimate purpose of investigating a possible crime.

In support of his assertion that the evidence of the seized marijuana should have been suppressed because it was obtained in violation of section 30.05, appellant relies heavily on *State v. Hobbs*, 824 S.W.2d 317 (Tex.App.—San Antonio 1992, pet. ref'd). In *Hobbs*, police officers entered the defendant's ranch without a warrant or permission on two separate occasions after receiving a tip that the defendant was growing marijuana on the property. The ranch was surrounded by a livestock fence and had "No Trespassing" signs posted on the entrance gates. After conducting surveillance on the property, the officers obtained a search warrant. The search made under the warrant resulted in the seizure of a large amount of marijuana. The trial court granted the defendant's motion to suppress under article 38.23 on the

---

**3.** Article 38.23 provides in relevant part:
(a) No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.

Tex.Code Crim.Proc.Ann. art. 38.23(a) (Vernon Supp.1993).

**4.** *See* Tex.Code Crim.Proc.Ann. art. 2.13 (Vernon 1977), art. 6.06 (Vernon Supp.1993).

ground the evidence was obtained in violation of section 30.05.

In upholding the trial court's decision, the court of appeals rejected the State's argument that section 30.05 did not apply to law enforcement officers acting in their official capacities. The court relied upon subsection (c) of the statute, which provides a defense to prosecution only for fire fighters and emergency medical services personnel carrying out their official duties under exigent circumstances. The court reasoned that if the legislature had intended to provide a similar defense for law enforcement officers, it could have done so.

As the *Hobbs* court correctly points out, the legislature could have provided law enforcement officers with a defense to prosecution under subsection (c) if it wanted to do so. The court in *Hobbs*, however, did not review the legislative history behind subsection (c) to determine why the legislature did not provide such a defense. We do so now, and because our research into the legislative history reveals why the legislature did not include in subsection (c) a defense for law enforcement officers, we decline to follow *Hobbs* in this case.

Section 30.05 provides that a person commits the offense of criminal trespass if he enters or remains on property or in a building of another without effective consent and he (1) had notice that the entry was forbidden or (2) received notice to depart but failed

to do so. *See* TEX.PENAL CODE ANN. § 30.-05(a) (Vernon 1989). In 1991, the 72nd Legislature amended section 30.05 and added subsection (c). Subsection (c) states in relevant part:

> (c) It is a defense to prosecution under this section that the actor at the time of the offense was a fire fighter or emergency medical services personnel ... acting in the lawful discharge of an official duty under exigent circumstances.

*Id.* § 30.05(c) (Vernon Supp.1993). The legislature added this defense in Texas House Bill 50, which was authored by Representative Henry Cuellar. H.B. 50 as it originated in the house initially provided a defense to prosecution not only for fire fighters and emergency medical services personnel, but also peace officers.[5] After the first reading of the bill on the house floor, it was referred to the House Committee on Criminal Jurisprudence, which held a public hearing on February 12, 1991. The tape recordings of this hearing are replete with committee discussions and interested citizens' testimony concerning the potential for abuse if such a defense were made available to peace officers.[6] In addition, one state representative questioned whether the proposed defense was even necessary in light of his belief that peace officers could avail themselves of a defense already in existence under section 9.21 of the Texas Penal Code.[7] At the close

---

5. HOUSE COMM. ON CRIMINAL JURISPRUDENCE, BILL ANALYSIS, Tex. H.B. 50, 72nd Leg., R.S. (1991).

6. *Hearings on Tex. H.B. 50 Before the House Comm. on Criminal Jurisprudence,* 72nd Leg., R.S. (Feb. 12, 1991) (tapes available from House Committee Services Office). These concerns centered primarily on whether the defense would (1) give peace officers license to enter private property without a search warrant and conduct illegal searches under the guise that they were lawfully on the property due to exigent circumstances, and (2) render evidence obtained as a result of such a trespass admissible because it would not have been obtained in violation of state law.

7. The following exchange took place at the public hearing:

Rep. Place: Why wouldn't this be covered under [section] 9.21 Necessity of Public Duty defense in the Penal Code? I mean, is this an elaboration of that? Because 9.21, my under-

standing is, would cover a police officer—it may not be as specific as what you're saying and I have no real problem with what you're saying, but that's what I thought of.

Rep. Cuellar: Again, something happened and again I don't want to misstate this because I don't remember but apparently something happened with some police officer and they suggested out of precaution to go ahead and add this and in fact the other, if I can say this, the emergency medical services personnel was also added on during committee here last time. I don't know but apparently they wanted something specific on this—a specific defense.

Rep. Place: I was just wondering if you knew anything in particular about a particular situation where that necessity defense might have been used and it was deemed inadequate in some way or another. I'm just curious.

Rep. Cuellar: Allen, I really don't know, but apparently something did happen with this. They needed it.

of the hearing, H.B. 50 was sent without objection to the Substantive Subcommittee of the House Committee on Criminal Jurisprudence.[8] The subcommittee held a formal meeting on March 11, 1991, and voted unanimously to return H.B. 50 to the full committee with the recommendation that it be passed.[9] On March 12, 1991, the full committee held a second public hearing. At the hearing the committee voted unanimously, with one absence excused, that H.B. 50 be reported back to the full house with the recommendation that it be passed.[10]

On March 20, 1991, the second reading of H.B. 50 was held on the house floor. During the floor debate, several legislators again expressed concern over the potential for abuse of this defense by peace officers.[11] In addition, a bill analysis prepared by the House Research Organization after H.B. 50 reached its second reading reveals that the legislature was aware that opponents of the bill thought a specific defense to prosecution under section 30.05 was unnecessary. These opponents considered the defense of "necessity" in section 9.22 of the penal code adequate to protect peace officers from prosecution for any criminal trespass that might result from the performance of their official duties under exigent circumstances.[12]

Near the close of debate on the house floor, Representative Eddie Cavazos proposed an amendment to the bill to strike the phrase "peace officer" so that the defense would apply only to fire fighters and emergency medical personnel.[13] The amendment was adopted without objection and H.B. 50 passed to engrossment.[14] The following day, March 21, the third reading of the bill was held on the house floor and the bill was finally passed by a non-record vote.[15] H.B. 50 was passed later by the Senate, without further amendment, on May 26, 1991, by a viva-voce vote.[16]

It is clear from the above committee meeting discussions and floor debates why the legislature did not provide a defense to prosecution for peace officers under section 30.05(c). The legislature obviously was concerned that peace officers might enter a person's property and conduct an illegal search under the pretext they were there because of exigent circumstances. But the legislature was aware too that peace officers could avail

*Hearings on Tex. H.B. 50 Before the House Comm. on Criminal Jurisprudence, 72nd Leg., R.S. (Feb. 12, 1991) (tapes available from House Committee Services Office). Ken Houp, testifying in opposition to H.B. 50 on behalf of the Texas Criminal Defense Lawyers Association, also drew to the committee members attention his belief that the proposed defense was unnecessary because the "justification" defenses in the penal code protected peace officers from prosecution under section 30.05.*

8. HOUSE COMM. ON CRIMINAL JURISPRUDENCE MINUTES 5, 72nd Leg., R.S. (Feb. 12, 1991).

9. SUBSTANTIVE SUBCOMMITTEE OF HOUSE COMM. ON CRIMINAL JURISPRUDENCE MINUTES 1, 72nd Leg., R.S. (Mar. 11, 1991).

10. HOUSE COMM. ON CRIMINAL JURISPRUDENCE MINUTES 1, 72nd Leg., R.S. (Mar. 12, 1991).

11. Debate on Tex. H.B. 50 on the Floor of the House, 72nd Leg., R.S. (Mar. 20, 1991) (tapes available from House Committee Services Office). In addition to the constitutional implications previously raised, concern was also expressed over the effect the proposed defense might have on collateral civil litigation arising out of a peace officer's entry onto private property.

12. HOUSE RESEARCH ORGANIZATION, BILL ANALYSIS, Tex. H.B. 50, 72nd Leg., R.S. (1991).

13. Debate on Tex. H.B. 50 on the Floor of the House, 72nd Leg., R.S. (Mar. 20, 1991) (tapes available from House Committee Services Office). Prior to the Cavazos amendment, the house adopted an amendment by Representative Harold Dutton that would have rendered inadmissible any evidence obtained as a result of a peace officer's trespass onto private property.

14. Debate on Tex. H.B. 50 on the Floor of the House, 72nd Leg., R.S. (Mar. 20, 1991) (tapes available from House Committee Services Office).

15. Debate on Tex. H.B. 50 on the Floor of the House, 72nd Leg., R.S. (Mar. 21, 1991) (tapes available from House Committee Services Office). Because the Cavazos amendment deleted "peace officer" from the bill, the house adopted during the third reading of the bill an amendment by Representative Robert Eckels deleting the Dutton amendment relating to the inadmissibility of any evidence obtained by peace officers as a result of a trespass onto private property.

16. Act of June 10, 1991, 72nd Leg., R.S., ch. 308, 1991 Tex.Gen.Laws 1343, 1343.

themselves of at least two separate defenses under the penal code to avoid prosecution for any criminal trespass they might commit in the course of performing their official duties under exigent circumstances. We conclude based on the statute's legislative history that one of the reasons the legislature did not provide a specific defense to prosecution for peace officers under section 30.05(c) is because an adequate defense to prosecution for this offense is available under section 9.21 of the Texas Penal Code.[17]

 Section 9.21, entitled "Public Duty," provides that conduct is justified if the actor reasonably believes the conduct is required or authorized by law, by the judgment or order of a competent court or other governmental tribunal, or in the execution of legal process. *See* TEX.PENAL CODE ANN. § 9.21 (Vernon 1974). In this case, Hughey testified he entered appellant's property because there were suspicious persons reported in the area and he could not determine from standing outside the gate if appellant's residence was "okay." Hughey testified appellant's property was in a high crime area and that he had been dispatched to the area more than eight times to investigate burglaries. Based on this background knowledge, the information he received in the dispatch and from the man who approached him outside the property, the fact he did not know if the owner of the property was there, and the rate of burglaries in the area, he stated he had reason to believe there might have been a burglary at the residence.

The record supports a conclusion that Hughey and Garvin reasonably believed their entry onto appellant's property was required to carry out their statutory duty to suppress crime and prevent offenses against the property of another. *See* TEX.CODE CRIM.PROC.

ANN. art. 2.13 (Vernon 1977), art. 6.06 (Vernon Supp.1993). As such, their conduct was justified under section 9.21, and the marijuana found on appellant's property was not obtained in violation of section 30.05. The trial court did not err in denying appellant's motion to suppress on this ground. We overrule appellant's second point of error.

### The Warrantless Arrest

Appellant contends in his first point of error the trial court reversibly erred in overruling his pretrial motion to suppress evidence because Hughey and Garvin lacked probable cause to arrest him without a warrant under both the Fourth Amendment to the United States Constitution and article I, section 9 of the Texas Constitution. Appellant also contends his warrantless arrest was not authorized under articles 14.01, 14.03, or 14.04 of the Texas Code of Criminal Procedure. In response, the State steadfastly contends appellant's warrantless arrest was justified under article 14.03(a)(1).[18] Article 14.-03(a)(1) authorizes the warrantless arrest of a person found in a suspicious place and under circumstances that reasonably show the person has been guilty of some felony or breach of the peace, or that the person threatens to commit or is about to commit some offense. *See* TEX.CODE CRIM.PROC.ANN. art. 14.03(a)(1) (Vernon Supp.1993). The State concedes that appellant's property was not a suspicious place when Hughey and Garvin first entered. It contends, however, appellant's sudden flight from the deputies, the fact the deputies did not know appellant was the owner of the property, and appellant's hurried disposal of the white box transformed his property into a suspicious place and gave the officers reason to believe appellant was committing a burglary or theft.

---

**17.** As noted previously, the legislative history indicates section 9.22 of the penal code may also provide a defense to prosecution for peace officers. Because we find it unnecessary to consider section 9.22 as a defense for the deputies in this case, we express no opinion on whether it does.

**18.** The State does not contend appellant's arrest was justified under article 14.01 or 14.02, which authorize the warrantless arrest of an individual for an offense committed within the view or presence of a police officer or magistrate. *See*

TEX.CODE CRIM.PROC.ANN. arts. 14.01, 14.02 (Vernon 1977). Even so, we conclude appellant's arrest cannot be upheld under either provision because no magistrate was present on appellant's property and Hughey testified appellant had not committed a crime at the point he arrested him. Similarly, we conclude appellant's arrest was not justified under article 14.04 because the record does not establish a credible person represented to Hughey that appellant had committed a felony. *See id.* art. 14.04.

Alternatively, the State contends evidence of the marijuana discovered in the white box should not be excluded because appellant abandoned it prior to his alleged illegal arrest.

■■■ Although appellant in his brief argues his warrantless arrest violated both the Fourth Amendment and article I, section 9, he fails to separate these federal and state constitutional issues into separate grounds and provide a distinct substantive analysis or argument on each ground. *See Heitman v. State,* 815 S.W.2d 681, 690 n. 23 (Tex.Crim. App.1991). The failure to brief separately state and federal constitutional issues is grounds for overruling a point of error as multifarious. *See id.* But because appellant has briefed this point of error in a manner sufficient for us to determine whether his arrest violated the Fourth Amendment, we address it to that extent. We decline, however, to address separately whether his arrest also violated article I, section 9 and conclude for the following reason it is unnecessary for us to do so.

Before the Texas Court of Criminal Appeals's opinion in *Heitman,* the protection provided by the Fourth Amendment and article I, section 9 was coextensive. Consequently, Texas courts interpreted search and seizure issues identically under both constitutional provisions. In *Heitman,* the court of criminal appeals abandoned the long-standing tradition of interpreting article I, section 9 in lockstep with the Fourth Amendment. In doing so, the court recognized the federal constitution sets the minimum protection a state must afford its citizens and that while a state constitution cannot subtract from the rights guaranteed by the federal constitution, it can provide additional rights to its citizens. *See id.* at 690.

Because the facts of this case impel us to conclude appellant's warrantless arrest violated the minimum safeguards afforded by the Fourth Amendment, appellant's arrest necessarily violated these same minimum protections as they exist under article I, section 9. Accordingly, a separate analysis under article I, section 9 is unnecessary to our disposition of appellant's point of error.

We note at the outset of our analysis that, although Hughey testified he was merely "detaining" appellant by handcuffing him, appellant argued in his brief and the State conceded at oral argument that the deputies arrested appellant at the point when they caught and handcuffed him. Even without the State's concession, however, we conclude under the facts of this case that appellant was arrested at the moment Hughey physically restrained him and secured him with handcuffs. The deputies did not merely detain him. *See California v. Hodari D.,* 499 U.S. 621, 626–28, 111 S.Ct. 1547, 1551, 113 L.Ed.2d 690 (1991) (person is arrested for fourth amendment purposes when his movement is restrained by peace officer's application of physical force or he submits to an assertion of authority by peace officer); *Amores v. State,* 816 S.W.2d 407, 411 (Tex. Crim.App.1991) (arrest occurs when person's liberty of movement is restricted or restrained).

■■■ As a general rule, police officers must obtain an arrest warrant before taking a person into custody. *See DeJarnette v. State,* 732 S.W.2d 346, 349 (Tex.Crim.App. 1987). But police officers may arrest an individual without a warrant if there is probable cause with respect to the individual and the arrest falls within one of the statutory exceptions to the warrant requirement contained in articles 14.01 through 14.04 of the Texas Code of Criminal Procedure. *See Stull v. State,* 772 S.W.2d 449, 451 (Tex.Crim. App.1989). It is the State's burden to prove a warrantless arrest is based on probable cause and that the arrest meets one of the statutory exceptions to the warrant requirement. *See Amores,* 816 S.W.2d at 413; *Stevenson v. State,* 780 S.W.2d 294, 296 (Tex. App.—Tyler 1989, no pet.) (per curiam).

■■■ The "totality of the circumstances" test applies in Texas for determining whether probable cause exists for a warrantless arrest. *See Amores,* 816 S.W.2d at 413. Probable cause exists if at the moment of arrest the facts and circumstances within the officer's knowledge and of which he had reasonably trustworthy information were sufficient in themselves to warrant a man of reasonable caution to believe a particular

person had committed or was committing an offense. *See id.* To determine whether probable cause exists, we look to the objective facts known to the officer at the time of the arrest. The officer's subjective conclusions or later-acquired knowledge, like the fruits of a search, cannot in retrospect bolster a claim of probable cause at the time of the arrest. *See id.* at 415. Moreover, an arresting officer's hunch, suspicion, or good faith perception alone are insufficient to constitute probable cause for an arrest. *See Lunde v. State,* 736 S.W.2d 665, 667 (Tex. Crim.App.1987). To constitute probable cause, the events perceived by the officer must be out of the ordinary and suspicious and must tie the suspect with a criminal act. The individual's conduct cannot be as consistent with innocent activity as it is with criminal activity. *See id.* Deliberately furtive actions and flight at the approach of a police officer, when coupled with specific knowledge on the part of the officer relating the suspect to the evidence of crime, are proper factors to consider in determining whether probable cause supports a decision to arrest. *See Muniz v. State,* 672 S.W.2d 804, 806 (Tex. Crim.App.1984). Flight from an officer without more, however, cannot support a determination of probable cause. *See Burkes v. State,* 830 S.W.2d 959, 960 (Tex.App.—Tyler 1992, no pet.) (per curiam).

Article 14.03(a)(1) requires the legal equivalent of constitutional probable cause. *See Amores,* 816 S.W.2d at 413. Article 14.03(a)(1) is to be strictly construed and should be applied to authorize warrantless arrests in only limited situations. *See Johnson v. State,* 722 S.W.2d 417, 421 (Tex.Crim. App.1986), *overruled on other grounds, McKenna v. State,* 780 S.W.2d 797, 800 (Tex. Crim.App.1989); *Holland v. State,* 788 S.W.2d 112, 113 (Tex.App.—Dallas 1990, pet. ref'd). Where events are as consistent with innocent activity as they are with criminal activity, the warrantless arrest of a person based on those events cannot be justified under article 14.03(a)(1). *See Amores,* 816 S.W.2d at 414. In addressing the types of areas constituting a "suspicious place," Texas courts have noted that few, if any, places are suspicious in and of themselves. *See Johnson,* 722 S.W.2d at 421; *Holland,* 788 S.W.2d at 115. The determination of whether a place is suspicious is highly fact-specific. *See Holland,* 788 S.W.2d at 114. Additional facts available to an officer plus reasonable inferences from those facts with respect to a particular location may justify a conclusion that the location is a suspicious place. *See Johnson,* 722 S.W.2d at 421; *Holland,* 788 S.W.2d at 115.

Our record reveals the objective facts and circumstances known to Hughey at the time of appellant's arrest. Hughey testified (1) he saw appellant walk out of a building carrying a white box; (2) he did not know appellant was the owner of the property at that time; (3) appellant looked back at Hughey and began running away from him; (4) he called out for appellant to stop, but appellant did not do so; (5) appellant threw the white box as he was running; and (6) appellant's residence was in an area where a number of burglaries had occurred. Hughey also thought it was suspicious when appellant walked out of the building carrying a box.

We conclude the State failed to meet its burden of showing that probable cause existed with respect to appellant and that appellant's arrest was justified under article 14.-03(a)(1). None of the facts and circumstances within Hughey's knowledge and of which he had reasonably trustworthy information were sufficient in themselves to create a reasonable belief that appellant had committed or was committing a crime. Although Hughey testified appellant's property was in a high crime area, he stated no specific crime was reported to him prior to entering appellant's property and that after entering the property he saw no evidence a crime had taken place. He also stated no crime had been committed in his presence when he arrested appellant. Hughey testified he thought it was "suspicious" when appellant walked out of the building carrying a box; however, a mere hunch or suspicion that appellant was involved in criminal activity is insufficient to establish probable cause for his arrest. The white box by itself gave no indication of being stolen, and appellant's action in carrying the box was as consistent with innocent activity as it was with criminal

activity. Moreover, Hughey did not retrieve the box and discover the marijuana until *after* he arrested appellant. This later-discovered fact cannot in hindsight create probable cause to justify appellant's arrest. Finally, without any *specific knowledge* on Hughey's part linking appellant to evidence of a crime, appellant's flight and his furtive gesture in disposing of the box are insufficient in themselves to justify a finding of probable cause or to transform appellant's property into a suspicious place as contemplated by article 14.03(a)(1). Based upon the foregoing, we hold appellant's arrest when the deputies caught and handcuffed him violated the Fourth Amendment to the United States Constitution.

Although we hold appellant's arrest was illegal, we must still consider whether, as the State contends, evidence of the marijuana found in the white box should not be suppressed because it was abandoned by appellant before the deputies arrested him. Appellant does not address this issue in his brief. Appellant contends only that the evidence seized *pursuant* to his illegal arrest should have been suppressed by the trial court.

■ To resolve the issue of "abandonment," we normally would consider (1) whether appellant intended to abandon the marijuana and (2) if so, whether his decision to do so was the product of police misconduct. *See Hawkins v. State,* 758 S.W.2d 255, 257–58 (Tex.Crim.App.1988). Because appellant discarded the marijuana *before* he was illegally seized, his decision to do so could not have been the product of the illegal arrest. Therefore, we need only consider whether appellant intended to abandon the marijuana.

■ Although *Hawkins* does not clearly indicate how to determine whether a defendant intended to abandon a particular item of property, we find instructive the following discussion by the court of criminal appeals regarding the issue of intent:

> [the] issue is not abandonment in the strict property sense, but whether the person prejudiced by the search had voluntarily discarded, left behind, or otherwise relinquished his interest in the property in

question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search.

*Id.* at 258 (quoting *United States v. Colbert,* 474 F.2d 174, 176 (5th Cir.1973)). Although appellant in this case was on his own property, he threw the box containing the marijuana as he fled from the deputies and while he was within their sight. Under these circumstances, appellant relinquished his interest in the box in such a manner that he could no longer retain a *reasonable* expectation of privacy with regard to it. We hold appellant abandoned the marijuana found in the white box. Further, because appellant abandoned the marijuana before Hughey caught and handcuffed him, the marijuana was not seized pursuant to appellant's illegal arrest. *See Hodari D.,* 499 U.S. at 628–30, 111 S.Ct. at 1552 (cocaine abandoned by defendant prior to being illegally seized was not fruit of illegal seizure); *Taylor v. State,* 820 S.W.2d 392, 395 (Tex.App.—Houston [14th Dist.] 1991, no pet.) (defendant who threw cocaine from car parked on private property abandoned it before illegal arrest occurred and officer's retrieval of it not a seizure).

Moreover, when appellant abandoned the box on the roof of the small barn, he was in an area outside the constitutionally protected curtilage of his residence. *See United States v. Dunn,* 480 U.S. 294, 301, 107 S.Ct. 1134, 1139, 94 L.Ed.2d 326 (1987). Because no reasonable expectation of privacy exists in this area of open field, appellant could not have held a reasonable expectation of privacy in the box he discarded while in this area. Accordingly, Hughey's retrieval of the box from the area of open field in which appellant discarded it and his examination of its contents did not rise to the level of a seizure under the Fourth Amendment. *See Hester v. United States,* 265 U.S. 57, 58–59, 44 S.Ct. 445, 446, 68 L.Ed. 898 (1924) (no seizure occurred where officer retrieved and examined contents of bottle of moonshine whiskey defendant abandoned in open field on property where he lived). Based upon the foregoing, we hold the trial court did not reversibly err in denying appellant's motion to suppress this evidence. We overrule appellant's first point of error.

### The Consent to Search

Because we have concluded appellant's arrest was improper under the Fourth Amendment, evidence of the marijuana obtained from the later consensual search of his house would normally be suppressed under article 38.23 and the federal exclusionary rule as the fruit of the illegal seizure. *See Boyle v. State*, 820 S.W.2d 122, 130 (Tex.Crim.App. 1989), *cert. denied*, —— U.S. ——, 112 S.Ct. 1297, 117 L.Ed.2d 520 (1992). On the other hand, if appellant's written consent to search was sufficiently attenuated from the illegal arrest so as to remove any taint associated with the arrest, the evidence of this marijuana would not be subject to suppression. *See id.* Appellant contends in his third point of error that his consent to search was not voluntary and was tainted by his illegal arrest. He asserts the trial court reversibly erred in overruling his pretrial motion to suppress evidence on this ground.

When attempting to prove the validity of a consent to search obtained after an illegal arrest, the State carries a much heavier burden than when attempting to prove the validity of a consent to search obtained after a legal arrest. *See Reyes v. State*, 741 S.W.2d 414, 431 (Tex.Crim.App. 1987). If the arrest were illegal, the State must prove the consent was voluntary and not obtained by exploitation of the illegal arrest. *See id.* To prove a defendant's consent to search was voluntary, the State must show by clear and convincing evidence that the consent was positive and unequivocal and was not the product of duress or coercion, whether actual or implied. *See id.* at 430. Whether a consent to search is voluntary is a question of fact to be determined from the totality of the circumstances. *See id.*

In this case, Pelphrey testified appellant did not appear apprehensive when he signed the consent form. According to Pelphrey, he and appellant spoke to each other in English and did not have any trouble communicating. Appellant never told Pelphrey he was unable to understand what Pelphrey was saying to him or asking him. Although appellant was handcuffed when he signed the form, Pelphrey testified it was normal procedure to have jail inmates hand-cuffed when in the conference room. It also appears only appellant and Pelphrey were present in the conference room when appellant signed the consent form. The fact consent was obtained in an environment with few police officers is significant in determining the validity of the consent. *See Johnson v. State*, 803 S.W.2d 272, 287 (Tex.Crim.App. 1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2914, 115 L.Ed.2d 1078 (1991), *overruled on other grounds, Heitman v. State*, 815 S.W.2d 681, 685 n. 6 (Tex.Crim.App.1991). Moreover, the fact Pelphrey (1) explained to appellant the sheriff's department wanted to search his house and all the outbuildings on the premises, (2) did not tell appellant a search warrant would be obtained for the premises regardless of whether he signed the consent form, and (3) told appellant he did not have to sign the form and that he could refuse to do so all weigh in favor of a conclusion that appellant voluntarily consented to the search of his property. *See Juarez v. State*, 758 S.W.2d 772, 782–83 (Tex.Crim.App. 1988). There is no evidence in the record indicating Pelphrey took unlawful advantage of the prior illegal arrest or resorted to intimidation, threats, physical or psychological abuse, or other coercive tactics to obtain appellant's consent. *See Vasquez v. State*, 804 S.W.2d 606, 611 (Tex.App.—Dallas 1991, no pet.). We conclude appellant's consent was positive, unequivocal, and not the product of duress or coercion. Consequently, we hold the State established by clear and convincing evidence that appellant's consent was voluntary.

We turn to the question of whether appellant's consent, though voluntary, was nonetheless obtained by exploitation of his illegal arrest. The burden is on the State to show by clear and convincing evidence that a voluntary consent to search was sufficiently attenuated from the illegal arrest so as not to have been obtained by exploitation of the arrest. *See Boyle*, 820 S.W.2d at 133. In determining this issue, we must review the following factors: (1) whether *Miranda* warnings were given, (2) the temporal proximity of the arrest and consent to search, (3) the presence of intervening circumstances, and (4) the purpose and fla-

grancy of the official misconduct. *See Reyes,* 741 S.W.2d at 431. These factors are by no means exhaustive, nor is equal weight assigned to each of the factors. No single factor is dispositive, and it is not required that each of these factors be resolved in the State's favor. *See Juarez,* 758 S.W.2d at 780.

■■■■ Although the fact *Miranda* warnings were given to a defendant does not purge the taint of an illegal arrest, *Miranda* warnings are an important factor in determining whether consent was obtained by exploitation of the illegal arrest. *See id.* at 781. Hughey administered *Miranda* warnings to appellant almost immediately after appellant was arrested. Appellant indicated he understood these warnings. This factor weighs in favor of the State.

■■■■ The second factor, temporal proximity, has been characterized as the least determinative factor involved. *See id.* The lack of a significant intervening period of time between arrest and consent is not in itself indicative that the consent was insufficiently attenuated from the illegal arrest. *See id.* The events or circumstances arising during the intervening time period are factors more significant than the length of the time itself. *See id.* Here, approximately two hours passed between appellant's arrest and his signing of the consent form. In cases where similar and even longer periods of time have been held insufficient to attenuate an illegal arrest, there were no intervening circumstances during those time periods. *See Brown v. Illinois,* 422 U.S. 590, 604, 95 S.Ct. 2254, 2262, 45 L.Ed.2d 416 (1975); *Boyle,* 820 S.W.2d at 132; *Gregg v. State,* 667 S.W.2d 125, 129–30 (Tex.Crim.App.1984), *overruled on other grounds, Russell v. State,* 717 S.W.2d 7, 10 n. 7 (Tex.Crim.App.1986). Accordingly, we conclude it is difficult to give the temporal proximity factor alone much weight without consideration of all other factors, including any intervening circumstances occurring between the time of appellant's illegal arrest and his consent. *See Juarez,* 758 S.W.2d at 782.

■■■■ The presence of intervening circumstances has been characterized as the most important factor to consider. *See Townsley v. State,* 652 S.W.2d 791, 797 (Tex.Crim.App. 1983). In this case, it is notable that appellant was not under illegal arrest when he signed the consent to search form. Appellant's illegal arrest was very brief in duration. It ended at the moment Hughey retrieved the abandoned box and discovered the marijuana inside. At that instant there was sufficient probable cause for Hughey to arrest appellant, and from that point on appellant was legally under arrest.[19] *See Little v. State,* 758 S.W.2d 551, 566 (Tex.Crim. App.), *cert. denied,* 488 U.S. 934, 109 S.Ct. 328, 102 L.Ed.2d 346 (1988); *Townsley,* 652 S.W.2d at 797. This subsequent acquisition of probable cause cannot alter the illegality of appellant's initial arrest. *See Townsley,* 652 S.W.2d at 796. But the fact appellant was legally confined at the time he signed the consent form is a significant intervening circumstance tending to break any causal connection between appellant's brief illegal arrest and his consent to search. *See United States v. Cherry,* 759 F.2d 1196, 1212 (5th Cir.1985), *cert. denied,* 479 U.S. 1056, 107 S.Ct. 932, 93 L.Ed.2d 983 (1987); *Little,* 758 S.W.2d at 566; *Townsley,* 652 S.W.2d at 797. In addition, although it is not constitutionally required that an accused be advised of his right to refuse consent, *see Boyle,* 820 S.W.2d at 132, appellant was fully informed he did not have to sign the form and could refuse to do so.[20] This is an intervening circumstance in favor of the State. *See Juarez,* 758 S.W.2d at 782. Likewise, informing appel-

**19.** We have previously determined the marijuana in the white box was not obtained pursuant to appellant's illegal arrest. Therefore, probable cause for appellant's valid arrest was not obtained by the fruits or exploitation of his prior illegal arrest. *See Townsley,* 652 S.W.2d at 797.

**20.** Appellant was apparently not reinformed by a magistrate or other judicial officer of his right to refuse consent. *See Boyle,* 820 S.W.2d at 132. However, the failure to take an accused before a magistrate does not in itself invalidate a consent to search unless such failure in some manner caused or contributed to bringing about the consent to search. *See Little,* 758 S.W.2d at 566. Moreover, appellant was informed of his right to an attorney through *Miranda* warnings. Hughey testified appellant indicated he understood the *Miranda* warnings but that appellant did not request an attorney.

lant the sheriff's department wanted to search his house and all the outbuildings on the premises and not suggesting to him coercively that a search warrant would be obtained even if he refused consent are intervening events weighing in the State's favor. *See id.* at 783. On the other hand, requesting appellant to sign the form rather than appellant "volunteering" to do so weighs in favor of appellant, as does the fact appellant was handcuffed when he signed the consent form. *See Cortez v. State,* 788 S.W.2d 89, 92–94 (Tex.App.—Houston [14th Dist.] 1990, no pet.). Viewing the evidence in the light most favorable to the trial court's ruling, we conclude the passage of time and intervening circumstances between appellant's illegal arrest and his signing of the consent form are factors that must be resolved in the State's favor.

Finally, we look at the purpose and flagrancy of the official misconduct. We conclude there was no misconduct on Pelphrey's part. We only examine, therefore, the other deputies' actions to resolve the issue.

First, it does not appear Hughey and Garvin's purpose in effecting what initially turned out to be an illegal arrest was merely to obtain appellant's consent to search his property. The record does not indicate this is a case where the arresting officers, with consent form in hand, illegally seized the defendant solely for the purpose of obtaining consent to search his home or personal property. *See Boyle,* 820 S.W.2d at 133; *Cortez,* 788 S.W.2d at 93. Moreover, the deputies' actions in entering appellant's property and later arresting him were not undertaken as an investigatory ploy or as an expedition to search for incriminating evidence they hoped to find. *See Juarez,* 758 S.W.2d at 783. There is no indication the deputies were even aware any contraband existed on appellant's property before their entry.

As to the flagrancy of the deputies' misconduct, we have already determined the question of probable cause for appellant's brief illegal arrest was not a close one. Viewed in isolation, this factor would tip the scale in favor of appellant. We cannot conclude, however, that the deputies' actions or their methods in carrying out appellant's arrest were flagrant misconduct. There was conflicting testimony about whether the deputies drew their weapons in effecting appellant's arrest. Hughey testified he did not have his firearm drawn, but Fields testified both Hughey and Garvin drew their weapons. Fields testified he heard appellant tell Hughey not to hit him anymore, but Fields also admitted he did not see Hughey hit appellant. As the sole trier of fact and arbiter of the witnesses' credibility, the trial judge in this case was free to believe some, all, or none of the testimony relating to Hughey and Garvin's conduct in carrying out appellant's arrest. *See Johnson,* 803 S.W.2d at 287. Accordingly, the trial court could have properly concluded that in arresting appellant the deputies resorted to no greater threats or coercive actions than those inherent in any arrest. *See Juarez,* 758 S.W.2d at 783. We hold the State established by clear and convincing evidence that appellant's voluntary consent to search was sufficiently attenuated from his illegal arrest so as not to have been obtained by exploitation of the arrest.

Because the record supports the trial court's finding that appellant's consent to search was given voluntarily and not obtained by exploitation of the illegal arrest, evidence of the marijuana obtained as a result of the search was not subject to suppression. Therefore, the trial court did not reversibly err in denying appellant's motion to suppress on this ground. We overrule appellant's third point of error.

We affirm the trial court's judgment.