TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-06-00717-CR

NO. 03-06-00720-CR

NO. 03-06-00721-CR






Wendi Mae Davidson, Appellant


v.


The State of Texas, Appellee






FROM THE DISTRICT COURT OF TOM GREEN COUNTY, 51ST JUDICIAL DISTRICT

NOS. A-05-0544-S, A-05-0545-S & A-05-0546-S

HONORABLE THOMAS J. GOSSETT, JUDGE PRESIDING




O P I N I O N



 Appellant Wendi Mae Davidson was indicted for the murder of her husband
Michael Severance and for two counts of tampering with or fabricating physical evidence with intent
to impair. See Tex. Penal Code Ann. §§ 19.02(b)(1), 37.09 (West 2003). Appellant filed a motion
to suppress evidence alleging that the placement and monitoring of a tracking device on her vehicle
constituted an unlawful search and therefore violated state statutory requirements and her
constitutional rights. See U.S. Const. amend. IV; Tex. Const. art. I, § 9; Tex. Code Crim. Proc. Ann.
art. 18.21 (West Supp. 2007); Tex. Penal Code Ann. § 16.06 (West 2003). Appellant also asserted
that the involvement of Air Force agents in the investigation violated the Posse Comitatus Act. See
18 U.S.C. § 1385 (2000). The trial court denied the motion to suppress, and appellant pleaded no
contest to all counts. In one issue on appeal, appellant contends that the trial court erred in denying
her motion to suppress evidence obtained from the installation of an electronic tracking device on the
undercarriage of her vehicle. For the reasons that follow, we affirm the trial court's order denying
appellant's motion to suppress and the judgments of conviction.


 FACTUAL AND PROCEDURAL BACKGROUND

 The evidence at the hearing on appellant's motion to suppress showed the following
facts. On January 16, 2005, appellant reported that Michael Severance, her husband and an airman
in the United States Air Force stationed at Dyess Air Force Base in Abilene, had been missing since
the day before. She advised the security forces section at the Air Force base that he may have
deserted his post, possibly fleeing to Canada because he was scheduled to be deployed. Investigators
with the Air Force Office of Special Investigations (AFOSI) began a missing persons/deserter
investigation. At the request of his superior officer, Officer Dennis McGuire of the San Angelo
Police Department began a parallel investigation into appellant's missing persons report and a report
that there was a theft of money from appellant's veterinary clinic located in San Angelo.

 During the course of their investigation, AFOSI agents interviewed various family
members and other friends and acquaintances of appellant and her husband. Although appellant told
the agents Severance had talked about deserting or leaving the service, Severance's family members
said that deserting would be uncharacteristic of him. The agents conducted a search of the vicinity
of appellant's veterinary clinic. On January 24, the agents met with representatives of various law
enforcement offices to coordinate their efforts in the missing person investigation. They learned that
Terrell Sheen, a local businessman, owned the building where appellant's veterinary clinic was
located and knew appellant and her family. AFOSI Special Agent Greg McCormick testified that,
early on in the investigation, the agents learned that appellant had "a horse on a ranch," but they did
not know the location of the ranch. The agents began researching Sheen's properties to determine
if Severance had access to them and might be found there. On January 28, Air Force personnel
conducted a ground search of a two-mile radius of the veterinary clinic "cover[ing] possible areas
that [Severance] could have walked off to."

 During the course of their investigation, AFOSI agents sought and received written
approval from the Regional Commander at Langley Air Force Base in Virginia to place a mobile
tracking device on appellant's vehicle, which displayed an Air Force sticker allowing entry onto
the Air Force base. On February 26, 2005, shortly after midnight, agents placed a tracking device
on the exterior undercarriage of appellant's vehicle as it was parked in the parking lot of her
veterinary clinic. The device tracked the whereabouts of appellant's vehicle on February 26 and 27. 
The data retrieved from the device showed that on February 27, appellant's vehicle traveled to a
remote location, identified as ranch property owned by Terrell Sheen. The agents contacted Sheen
on March 1. Sheen told the agents that appellant and Severance had access to his ranch property and
that appellant kept a horse there. Sheen consented to the agents' search of the property.

 Based on this additional information and Sheen's consent, on March 3, Sheen gave
the agents a tour of the entire ranch property. Sheen also told them that Severance had been to the
property and had access to it. Sheen allowed the agents access to all the buildings on the property
and showed them various ponds, including a large stock pond with a boat dock. The agents observed
that the ranch was gated and locked with a combination lock. There was a lengthy road leading to
a barn, mobile homes, fenced corrals, and ponds. Sheen allowed the agents to walk through the
mobile homes, barn, and outbuildings. Special Agent McCormick testified that the agents were
looking for a missing person: "We went to every place that someone could possibly hide without
going through the brush and looking under every rock."

 On March 5, 2005, Texas Ranger Shawn Palmer and San Angelo Police Sergeant
Jones interviewed appellant at the veterinary clinic. During the interview, the officers asked about
the Sheen property, the pond on the property, and about computer searches done on a computer at
the clinic, including internet searches on the subjects of polygraphs and "decomposition of a body
in water." (1) When the officers asked about the pond, appellant "became more abrupt in her answers
. . . [and] got kind of defensive," responding that her parents also had a pond on their property and
that Sheen's ranch had three ponds, not just one. After the interview, the officers met with AFOSI
agents and other officers in the vicinity. When Palmer noticed appellant's vehicle was no longer
parked at the clinic, he asked the AFOSI agents and a police officer to set up surveillance in the
vicinity of Sheen's ranch. Palmer testified:


 After interviewing her and discussing this ranch and the pond, I became concerned
that there was in fact something in the pond, possibly this missing person, if not
evidence of some sort, but she definitely showed some interest in that pond.


When the officers arrived at the ranch, appellant was attempting to enter the gate. A police officer
instructed appellant that she could not enter the property because police were securing the premises
for a search. After she was denied access, appellant left.

 That same day, Marshall Davidson, appellant's brother, contacted San Angelo police
officer McGuire, advising him of the possibility that Severance's body could be found in one of
the ponds on the Sheen ranch. Davidson requested a meeting. San Angelo police officers, including
McGuire, met with Davidson. Appellant and her parents were also present at the meeting. McGuire
testified at the hearing that everyone was "pretty upset." During the meeting, Marshall Davidson
informed the officers that they should search the pond on Sheen's property. McGuire and Palmer
testified that, during the meeting, they heard appellant say to her parents: "I didn't kill him, but
somebody did. I thought one of you did it, so I moved the body to protect you." Upon searching
the pond on Sheen's property pursuant to Sheen's consent, authorities located Michael Severance's
body.

 Upon locating Severance's body, AFOSI agents ceased their investigation. San
Angelo police and Texas Rangers obtained an arrest warrant for appellant and various search
warrants for her clinic, home, computer, and vehicle. Appellant was indicted for the murder of
Michael Severance and for two counts of tampering with or fabricating physical evidence with intent
to impair. See Tex. Penal Code Ann. §§ 19.02(b)(1), 37.09.


The Motion to Suppress 

 Appellant moved to suppress all evidence resulting from the installation and
monitoring of the tracking device on her vehicle. After a hearing that included the testimony of five
witnesses; the admission of an arrest warrant naming appellant, five search warrants and the
affidavits upon which they were based for appellant's clinic, home, computer, and vehicle; and the
AFOSI authorization for the tracking device, the trial court denied the motion to suppress. Appellant
did not testify. The trial court made the following findings of fact and conclusions of law:


 1. United States Air Force personnel were authorized to place the mobile
tracking device on the Defendant's vehicle.


 2. The mobile tracking device was placed on the Defendant's vehicle in
accordance with United States Air Force rules and regulations.


 3. There was no search by law enforcement officials in monitoring the tracking
device as there is no reasonable expectation of privacy in the observations of
Defendant's movements on a public thoroughfare, and therefore no violation
of the United States Constitution or the Texas Constitution.


 4. There was no violation of Article 18.21, Texas Code of Criminal Procedure,
as the placement of the mobile tracking device was authorized by proper
United States Air Force personnel.


 5. Even assuming there was a search, there was adequate attenuation by the
statements made to law enforcement by the Defendant's brother in stating
that they needed to look in the stock tank because the body was in the tank,
and further by Defendant's statements to her parents that she had placed the
body in the stock tank.



 After the denial of the motion to suppress, appellant pleaded no contest to all charges. 
The trial court assessed punishment at twenty-five years' imprisonment for the charge of murder
and ten years on both of the tampering counts, with the sentences to run concurrently. This appeal
followed.


ANALYSIS


 Appellant contends that the trial court erred in overruling her motion to suppress
because her "constitutional rights against unreasonable search and seizure were violated when law
enforcement agents illegally installed and used a mobile tracking device on her vehicle on private
property and tracked her movement on private land to which she had a reasonable expectation of
privacy." Specifically, appellant contends that because a state district judge did not authorize the use
of the tracking device, (i) its use was an unreasonable search in violation of the Fourth Amendment
of the United States Constitution and Article I, Section 9 of the Texas Constitution, (ii) AFOSI's
installation and use of the tracking device to obtain evidence from a search of private land violates
section 18.21 of the Texas Code of Criminal Procedure and Texas Penal Code section 16.06, and
(iii) therefore, the evidence wrongfully obtained should be suppressed pursuant to article 38.23 of
the Texas Code of Criminal Procedure. (2) See Tex. Code Crim. Proc. Ann. art. 38.23 (West 2005). 
Appellant seeks to suppress all evidence that was obtained from the tracking device or discovered
as a result of the use of the tracking device.


Standard of Review and Burden of Proof

 When a defendant seeks to suppress evidence based on a violation of the Fourth
Amendment of the United States Constitution or Article I, Section 9 of the Texas Constitution, the
burden of proof initially is upon the defendant. Russell v. State, 717 S.W.2d 7, 9 (Tex. Crim. App.
1986); Carroll v. State, 911 S.W.2d 210, 215 (Tex. App.--Austin 1995, no writ). As the movant
in a motion to suppress evidence, a defendant must produce evidence that defeats the presumption
of proper police conduct and shifts the burden to the prosecution. Russell, 717 S.W.2d at 9; Carroll,
911 S.W.2d at 215. A defendant meets his initial burden by establishing that the search and seizure
occurred without a warrant. Russell, 717 S.W.2d at 9; Carroll, 911 S.W.2d at 215. When the
validity of a search is challenged and the State produces a warrant, the defendant must go forward
to establish the warrant's invalidity. Russell, 717 S.W.2d at 9; Rumsey v. State, 675 S.W.2d 517,
520 (Tex. Crim. App. 1984); Carroll v. State, 911 S.W.2d at 215.

 We review a trial court's ruling on a motion to suppress under a bifurcated standard
of review, giving almost total deference to a trial court's determination of historical facts
and reviewing de novo the court's application of the law. Carmouche v. State, 10 S.W.3d 323, 327
(Tex. Crim. App. 2000) (citing Guzman v. State, 955 S.W.2d 85, 88-89 (Tex. Crim. App. 1997)). 
In reviewing the trial court's ruling on a motion to suppress, we view the evidence in the light most
favorable to the trial court's ruling. State v. Kelly, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). 
At a suppression hearing, the trial judge is the sole and exclusive trier of fact and judge of the
credibility of the witnesses and their testimony. Alvarado v. State, 853 S.W.2d 17, 23 (Tex. Crim.
App. 1993); Allridge v. State, 850 S.W.2d 471, 492 (Tex. Crim. App. 1991). We uphold the trial
court's ruling if it is reasonably supported by the record and is correct under any theory of law
applicable to the case. State v. Steelman, 93 S.W.3d 102, 107 (Tex. Crim. App. 2002). Absent an
abuse of discretion, we will not disturb the trial court's ruling on appeal where the evidence supports
the ruling. Carroll, 911 S.W.2d at 223. We consider only whether the trial court improperly applied
the law to the facts. Id. (citing Romero v. State, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990)).


Posse Comitatus Act

 Appellant contends that the involvement of military personnel in this investigation
violates the Posse Comitatus Act. See 18 U.S.C. § 1385. Appellant asserts that the involvement of
AFOSI agents in the investigation of Severance's disappearance "amounted to more than passively
coordinating a military investigation with a civilian criminal investigation" and therefore violates
the Act. She urges that this violation triggers the application of article 38.23 of the code of criminal
procedure, requiring exclusion of any evidence seized as a result of a violation of law. See
Tex. Code Crim. Proc. Ann. art. 38.23.

 The purpose of the Posse Comitatus Act is to uphold the American tradition of
restricting military intrusions into civilian affairs, except where Congress has recognized a specific
need for military assistance in law enforcement. See, e.g., United States v. Johnson, 410 F.3d 137,
146-47 (4th Cir.), cert. denied, 546 U.S. 952 (2005); United States v. Hartley, 796 F.2d 112, 114
(5th Cir. 1986); United States v. Walden, 490 F.2d 372, 375 (4th Cir. 1974). The Act states in full:


 Whoever, except in cases and under circumstances expressly authorized by the
Constitution or Act of Congress, willfully uses any part of the Army or the Air Force
as a posse comitatus or otherwise to execute the laws shall be fined under this title
or imprisoned not more than two years, or both.


18 U.S.C. § 1385. While the Posse Comitatus Act attempts to maintain the traditional separation
between military and civilian law enforcement, it does not prohibit all manner of cooperation
or interaction between civilians and the military. See Johnson, 410 F.3d at 147 (citing H.R. Rep.
No. 97-71, pt. 2, at 3 (1981), as reprinted in 1981 U.S.C.C.A.N. 1785, 1792 (discussing Congress'
adoption of the Military Support for Civilian Law Enforcement Agencies Act and Congress' intent
to "maximize the degree of cooperation between military and civilian law enforcement")).

 Appellant's claimed violation of the Posse Comitatus Act lacks merit for several
reasons. First, the use of military resources is authorized if there is an independent military purpose
for their involvement. See, e.g., Applewhite v. United States Air Force, 995 F.2d 997, 1001
(10th Cir. 1993) ("Since there was an independent military purpose of OSI's conduct, there
was necessarily no willful use of any part of the Air Force as a posse to execute civilian laws.");
United States v. Chon, 210 F.3d 990, 994 (9th Cir. 2000) ("Here, however, the NCIS agents'
activities were permissible because there was an independent military purpose for their
investigation--the protection of military equipment."). When the military merely coordinates its
ongoing investigation with civil law enforcement officers, the Posse Comitatus Act is not violated. 
See, e.g., United States v. Griley, 814 F.2d 967, 976 (4th Cir. 1987).

 In this case, appellant reported her husband, a military airman, missing and possibly
a deserter from his military duties. She made the report to the military. The independent military
purpose is to locate a service member who had deserted, a crime under article 85 of the Uniform
Code of Military Justice. See 10 U.S.C. § 885 (1998). (3) Article 8 of the Uniform Code of Military
Justice grants civilian authorities the power to apprehend deserters. See 10 U.S.C. § 808 (2007);
United States v. Khamsouk, 57 M.J. 282, 288 (U.S.C.A.A.F. 2002). Thus, there is express
authorization for military authorities to investigate deserters as well as to coordinate their activities
with civilian authorities. See 10 U.S.C. § 808 (providing that any civil officer may summarily
apprehend a deserter). At most, appellant's case involved a military/civilian cooperative effort.

 Second, the record does not support appellant's contention that the actions of the
AFOSI agents amounted to more than passively coordinating a military investigation with a civilian
criminal investigation. Testimony of the AFOSI agents amply supports the existence and pursuit of
an independent military purpose for the investigation. Commander Archibald Harner testified that
appellant reported her husband missing to military authorities on January 16. (4) Appellant told the
agents that her husband may have deserted, that he did not like being in the military, and that he
intended to leave the service to avoid an upcoming deployment. She told them that Severance
had "mentioned how easy it would be to disappear to Canada." The agents searched for him as a
missing person and possible deserter until Severance's body was recovered and their investigative
involvement then ceased. Special Agent McCormick testified that the military and law enforcement
authorities searched the premises of the Sheen ranch looking for a missing person, possibly someone
who had gone AWOL or deserted. The Request for Authorization for Use of Non-Consensual
Tracking Device submitted to the Commander of the AFOSI of the Department of the Air Force on
February 18 specified the purpose of the device was to ascertain the location where the "incidental"
"may be harboring, concealing, protecting, or assisting subject in his desertion from service." That
the investigation evolved into a criminal investigation does not mean that it did not have an original
military purpose or that it was a subterfuge for a civilian investigation. In any event, because
appellant set the military's investigation in motion, appellant is estopped from complaining that there
was one. See Jones v. State, 119 S.W.3d 766, 784 (Tex. Crim. App. 2003).

 Moreover, no violation of the Posse Comitatus Act occurred here. The trial court
found that the military authorities were authorized to place the tracking device on appellant's vehicle
and that it was placed on the vehicle in accordance with Air Force rules and regulations. The
military investigators obtained permission to use the tracking device after briefing their staff judge
advocate, who consulted with the United States Attorney, and applying for approval with their
Regional Commander. The evidence showed that the installation of the tracking device was
authorized by a Regional Commander of the United States AFOSI pursuant to its procedures. The
Commander reviewed the information contained within the four corners of the request for
authorization and granted the request. Agent Harner testified that appellant's red Camaro vehicle
displayed a Dyess Air Force Base sticker on its windshield, allowing her access to the base and its
services and subjecting appellant to its regulations. The Request iterates that approval authority
under military rules "only requires a Region commander's approval" and that "no search warrant or
search authorization is required as long as the installation and monitoring of the device is conducted
in a public area." The trial court expressly found that the agents fully complied with Air Force rules
and regulations. Appellant does not contend that the military violated any specific procedure or rule
in obtaining approval for and installing the tracking device. She claims only that military personnel
were required to comply with the warrant requirements of the Texas Code of Criminal Procedure. (5) 
As commander of AFOSI at Dyess Air Force Base, Commander Harner made a proper request for
the approval and installation of the tracking device, which was approved by the regional commander,
Colonel Edward Hagerty. Given the grant of legislative authority, the AFOSI investigation
constituted an independent military purpose conducted in accordance with military procedures and
regulations and was, therefore, not in violation of the Posse Comitatus Act.

 Finally, as the movant in the motion to suppress evidence, appellant was required to
produce evidence defeating the presumption of proper police conduct. Russell, 717 S.W.2d at 9. 
When the State produced evidence of the request for authorization of the installation of the device
by Commander Harner and its approval by USAF Colonel Hagerty, the burden was on appellant to
show evidence of its invalidity. Id. This appellant failed to do. (6) Appellant does not direct our
attention to any violation of military law, and the trial court found that the authorization was properly
obtained and that there was no violation of military law.

 Even if we were to find a violation of the Posse Comitatus Act, there is no remedy
available to appellant in this context. As a general matter, a violation of the Posse Comitatus Act
does not trigger the application of the exclusionary rule. Johnson, 410 F.3d at 149 (exclusionary rule
not a remedy for violations of the Act); United States v. Al-Talib, 55 F.3d 923, 930 (4th Cir. 1995);
Griley, 814 F.2d at 976; United States v. Wolffs, 594 F.2d 77, 85 (5th Cir. 1979) (holding that
application of an exclusionary rule in regards to a violation of the Act was not an appropriate
remedy, but that future widespread and repeated violations could require creating an exclusionary
rule). To the extent appellant contends exclusion was required under article 38.23, appellant cites
no authority for this proposition, and we have found none. (7) This result comports with the Supreme
Court's command to restrict application of the exclusionary rule to "those areas where its remedial
objectives are thought most efficaciously served." United States v. Calandra, 414 U.S. 338, 348
(1974). We conclude that the trial court did not abuse its discretion in finding that the authorization
of the military personnel was valid and in denying the motion to suppress.


Article 18.21

 Appellant nevertheless contends that, because they "piggy-backed" on the military
personnel's application and installation of the tracking device, the civil law enforcement authorities
"in collusion with" the AFOSI agents bypassed the requirement of a judicial order. See Tex. Code
Crim. Proc. Ann. art. 18.21. Appellant asserts that AFOSI's failure to seek a judicial order from a
state district court violated the express provisions of article 18.21. Appellant's reliance on article
18.21 is misplaced.

 Article 18.21 establishes procedures for acquiring judicial orders for, inter alia, the
use of pen registers, trap and trace devices, and for the installation and use of mobile tracking
devices. See id. Section 14 of article 18.21 limits the power to order the placement of mobile
tracking devices to state district judges and only upon the request of an authorized peace officer. Id.
art. 18.21, § 14. "Authorized peace officer" is defined in section 1(2)(A) of article 18.21 to include
a list of peace officers that are exclusively state officers. Id. art. 18.21, § 1(2)(A). Through
this limitation to state officers, article 18.21 does not purport to govern orders to place tracking
devices by non-state actors, such as federal agents. See State v. Toone, 872 S.W.2d 750, 752
(Tex. Crim. App. 1994) (holding that article 18.01 does not govern federal search warrants). (8) We
reject appellant's argument and hold that the installation was not barred by article 18.21.

 It is well established that evidence obtained by federal agents acting lawfully and
in conformity with federal authority is admissible in state criminal proceedings. State v. Toone,
823 S.W.2d 744, 748 (Tex. App.--Dallas 1992) ("protections afforded by the constitution of a
sovereign entity control the actions only of the agents of that sovereign entity"), aff'd on other
grounds, 872 S.W.2d 750 (Tex. Crim. App. 1994). But appellant is correct when she argues that
federal agents may not act as agents of the state police to circumvent the requirements of state law. 
See Toone, 823 S.W.2d at 748 (citing State v. Mollica, 554 A.2d 1315, 1329 (N.J. 1989)). If military
personnel are not acting pursuant to the special powers granted them under federal law to pursue
their independent military purpose and are instead acting as agents for the state police, they are
subject to the same statutes and constitutional standards as state officers. See id.; Lockett v. State,
879 S.W.2d 184, 190 (Tex. App.--Houston [14th Dist.] 1994, pet. ref'd). Where an operation
involves actors from various jurisdictions then, as here, the relationship must be examined to
determine whether federal agents are acting so as to circumvent the requirements of state law. See
Lockett, 879 S.W.2d at 190; Toone, 823 S.W.2d at 748; Mollica, 554 A.2d at 1329. As stated by
the Toone court:


 Evidence of antecedent mutual planning, joint operations, cooperative investigations,
or mutual assistance between federal and state officers may sufficiently establish
agency and serve to bring the conduct of the federal agents under the color of state
law. Conversely, mere contact, awareness of ongoing investigations, or the exchange
of information may not transform the relationship into one of agency.


Toone, 823 S.W.2d at 748. (9)

 Not every joint operation between state and federal actors results in an agency
relationship so as to bring federal agents under the color of state law. Federal agents, including
military personnel, often work in conjunction with other law enforcement authorities to achieve
federal objectives, and such cooperation should not be discouraged. It is the attempt by state officers
to do indirectly what their statutes or constitution prohibits them from doing directly, by using
federal agents to circumvent these requirements, that is prohibited. See Shurman v. United States,
219 F.2d 282, 287-88 (5th Cir. 1955) (evidence admissible where there was not such cooperation
between federal agents and state police as to demonstrate an attempt by federal authorities to
circumvent Fourth Amendment); Mollica, 554 A.2d at 1328 (essential objective of state exclusionary
rule is to deter unlawful state police conduct and thus no deterrence value for state officials is
frustrated by admitting evidence seized by federal officers under authority of, and in conformity with,
federal law). Thus, state officers may not use military personnel to obtain evidence indirectly that
they could not obtain directly in a lawful manner.

 Here, although the original military investigation evolved into a state criminal
investigation, it began as a report by appellant that her husband was missing and absent without
leave. Appellant told the AFOSI agents that her husband may have deserted, that he did not like
being in the military, and that he intended to leave the service to avoid an upcoming deployment. 
She told them that Severance had "mentioned how easy it would be to disappear to Canada." It was
appellant herself who set the military apparatus in motion. Given the independent military reason
for AFOSI's investigation, the military was entitled to employ its investigative tools to accomplish
the limited purpose of locating a serviceman reported missing and characterized as a possible
deserter by his spouse.


 The trial court found that military personnel were authorized to place the tracking
device on appellant's vehicle and followed their appropriate rules and regulations. (10) A review of the
evidence, giving deference to the trial court's factual findings and viewing the remaining facts in a
light most favorable to the trial court's ruling, shows that the military personnel pursued its
independent investigative purpose and did not improperly serve as agents of the civilian law
enforcement authorities to circumvent appellant's statutory or constitutional rights as prohibited
under Toone. Further, appellant did not adduce evidence or demonstrate in any manner that the law
enforcement officers did indirectly through the AFOSI agents what they were prohibited from doing
directly in order to circumvent state statutory requirements. See Shurman, 219 F.2d at 288.

 The trial court correctly found that article 18.21 does not apply to the AFOSI agents
and that the placement of the tracking device on appellant's vehicle was not a violation of that
statute. No Texas statute governs the use of tracking devices by federal agents and, apart from what
the constitution may require, the conduct of the agents in attaching and monitoring the device was
not contrary to article 18.21. But the trial court also found that the tracking device was placed on
appellant's vehicle in accordance with Air Force rules and regulations. Appellant did not challenge
below in what respect the military personnel failed to follow any of its procedures and may not raise
this challenge for the first time on appeal. See Tex. R. App. P. 33.1. (11)


State and Federal Constitutional Provisions

 The issue on which the lawfulness of the remaining conduct turns, then, is whether
the monitoring of the tracking device was violative of appellant's rights under the Fourth
Amendment of the United States Constitution or Article I, Section 9 of the Texas Constitution. (12) 
Although the evidence appellant sought to suppress is not entirely clear, in her brief on appeal, she
states that "[b]ased on information obtained through the use of the tracking device, Special Agent
Harner determined routine areas of travel for Ms. Davidson's vehicle as well as one location he
described as 'way outside that area to a remote location.'" From that information, Agent Harner
learned that the property to which the vehicle was driven was owned by Sheen. Sheen advised the
agents that appellant had access to the property and kept a horse there.

 Appellant acknowledges that she cannot challenge the fact that the agents tracked her
car while it was on public streets. (13) See, e.g., United States v. Knotts, 460 U.S. 276, 281-82 (1983);
Nored v. State, 875 S.W.2d 392, 395 (Tex. App.--Dallas 1994, pet. ref'd). Rather, appellant argues
that, by tracking her vehicle "onto private land, not visible from the public road, and to which she
had a reasonable expectation of privacy," the AFOSI agents violated her constitutional rights. She
claims that the agents monitored the tracking device as she drove through the Sheen property and
thereby identified a stock pond located on the ranch property where the law enforcement authorities
eventually found Severance's body.

 Relying on United States v. Karo, 468 U.S. 705 (1984), appellant argues that
the evidence obtained from the monitoring of the tracking device on private land is evidence
discovered as a result of an illegal search and that it should be excluded as "fruit of the poisonous
tree." But appellant's reliance on Karo is misplaced. In Karo, the Court limited its prior holding
in Knotts when it held that it was a violation of the Fourth Amendment for the government to
monitor a warrantless tracking device while it was inside a person's private residence. 468 U.S. at
714-15. In contrast to the facts of Karo, AFOSI agents were not monitoring the movements of
appellant's vehicle inside a private residence. Appellant has cited no authority--and we have found
none--that would extend the holding of Karo to the monitoring of a tracking device in the open
fields under the circumstances presented here.

 The purpose of both the Fourth Amendment and Article I, Section 9 "is to safeguard
an individual's legitimate expectation of privacy from unreasonable governmental intrusions." 
Richardson v. State, 865 S.W.2d 944, 948 (Tex. Crim. App. 1993). An accused has standing, under
both constitutional provisions, to challenge the admission of evidence obtained by a governmental
intrusion only if he had a legitimate expectation of privacy in the place invaded. Rakas v. Illinois,
439 U.S. 128, 143 (1978); Fuller v. State, 829 S.W.2d 191, 202 (Tex. Crim. App. 1992). The burden
of proving facts establishing a legitimate expectation of privacy rests with the accused. Calloway
v. State, 743 S.W.2d 645, 650 (Tex. Crim. App. 1988). The burden to establish standing rests on
the party seeking to exclude the evidence. Kothe v. State, 152 S.W.3d 54, 60 (Tex. Crim. App.
2004); Villarreal v. State, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996); State v. Klima, 934 S.W.2d
109, 110 (Tex. Crim. App. 1996). To carry this burden, a defendant must demonstrate (i) he had an
actual, subjective expectation of privacy, and (ii) the subjective expectation of privacy is one that
society is prepared to recognize as objectively reasonable. Smith v. Maryland, 442 U.S. 735, 740-41
(1979); Villarreal, 935 S.W.2d at 138.

 To determine whether an accused's subjective expectation was one that society was
prepared to recognize as objectively reasonable, a court may consider several factors, including: 
(1) whether the accused had a property or possessory interest in the place invaded; (2) whether he
was legitimately in the place invaded; (3) whether he had complete dominion or control and the right
to exclude others; (4) whether, before the intrusion, he took normal precautions customarily taken
by those seeking privacy; (5) whether he put the place to some private use; and (6) whether his claim
of privacy is consistent with historical notions of privacy. Calloway, 743 S.W.2d at 651. Whether
a defendant has standing to contest a search and seizure is a question of law we review de novo.
Parker v. State, 182 S.W.3d 923, 925 (Tex. Crim. App. 2006). The question of whether appellant's
subjective expectation of privacy was one that society was prepared to recognize as reasonable is
also a question of law. Villarreal, 935 S.W.2d at 128.

 Viewing the record evidence and all reasonable inferences therefrom in the light most
favorable to the trial court's ruling, we cannot say that the trial court abused its discretion in finding
that there was no reasonable expectation of privacy and that appellant failed to establish standing. 
We will assume--as appellant has argued--that the property to which she claims an expectation of
privacy and was invaded by virtue of the tracking device is "land, in an area not visible from the
public road, to which the public did not have access that the officers ultimately recovered the body
of Michael Severance." Appellant contends that she has a reasonable expectation of privacy because
(i) the property was behind a locked gate, (ii) appellant had access to the land with the express
consent of the owner of the land, (iii) "she and the owner had excluded members of the public from
that land with fencing and a locked gate," and (iv) she kept a horse on the property.

 But the evidence does not establish that appellant had a reasonable expectation of
privacy. The evidence showed only that appellant and Severance had access to property with a
locked gate owned by Terrell Sheen and that appellant maintained a horse on the property. There
is nothing in the record that showed where the horse was maintained or to what portion of the
property appellant had access and the terms of the access. Officer McCormick testified that Sheen
"told us that she kept a horse out on the property" and that she had access to the property. The
evidence demonstrated that appellant was no more than a casual visitor to the property.

 As in Villarreal, there is nothing in the record here to show that appellant had a
property or possessory interest, unrestricted access, complete dominion and control, the right to
exclude others, or any other expectations of privacy in the property that were of the types that society
views as objectively reasonable. See id. Nor was there any evidence that appellant intended to or
had stayed overnight. See id. At best, appellant's evidence addresses one of the six relevant factors
to be considered--that she had legitimate presence in the place searched. See id. Appellant's mere
assertion in her brief that she and Sheen excluded the public from the land with fencing and a locked
gate does not satisfy her burden to prove a legitimate expectation of privacy in Sheen's ranch. As
in Villarreal, appellant presented no evidence that she was anything other than a guest with
indeterminate access to the property. See id. The evidence did not establish that appellant's
subjective expectation of privacy was one that society was prepared to recognize as objectively
reasonable under the circumstances.

 In any event, the government's intrusion upon the open fields is not one of those
"unreasonable searches" proscribed by the Fourth Amendment or Article I, Section 9. The Fourth
Amendment and Article I, Section 9 accord special protection to people in their persons, houses,
papers, and effects, but that protection does not extend to "open fields." (14) Oliver v. United States,
466 U.S. 170, 178-79 (1984); Hester v. United States, 265 U.S. 57, 59 (1924); Westfall v. State,
10 S.W.3d 85, 89 (Tex. App.--Waco 1999, no pet.); Carroll, 911 S.W.2d at 217; White v. State,
890 S.W.2d 131, 134 (Tex. App.--Texarkana 1994, no pet.). The "open fields" doctrine allows a
law enforcement officer to enter and search an area of land without a warrant. Carroll, 911 S.W.2d
at 217; Rosalez v. State, 875 S.W.2d 705, 713 (Tex. App.--Dallas 1993, pet. ref'd). An "open field"
need not be "open" or a "field" as those terms are commonly used; the term "open field" may
be defined as any unoccupied or undeveloped area outside the curtilage of a dwelling. Westfall,
10 S.W.3d at 89; Rosalez, 875 S.W.2d at 714 (citing Oliver, 466 U.S. at 180 n.11). An individual
may not legitimately demand privacy for activities conducted out of doors in fields, except in the
area immediately surrounding the home, i.e., the curtilage. Oliver, 466 U.S. at 178. (15) As Justice
Holmes explained in Hester v. United States, "[T]he special protection accorded by the Fourth
Amendment to the people in their 'persons, houses, papers, and effects,' is not extended to the open
fields. The distinction between the latter and the house is as old as the common law." 265 U.S. at
59. In contrast to the "sanctity of the home," the Supreme Court recognized in Oliver that the "open
fields do not provide the setting for those intimate activities that the [Fourth] Amendment is intended
to shelter from government interference or surveillance." Oliver, 466 U.S. at 179. The Court
reasoned:


 There is no societal interest in protecting the privacy of those activities, such as the
cultivation of crops, that occur in open fields. Moreover, as a practical matter these
lands usually are accessible to the public and the police in ways that a home, an
office, or commercial structure would not be. It is not generally true that fences or
'No Trespassing' signs effectively bar the public from viewing open fields in rural
areas. And both [parties] concede that the public and police lawfully may survey
lands from the air. For these reasons, the asserted expectation of privacy in open
fields is not an expectation that 'society recognizes as reasonable.'


Id. The Court distinguished the "open fields" of "the vast expanse of some western ranches" or
woods from the "curtilage," the land immediately surrounding and associated with the home. Id.;
see also Rosalez, 875 S.W.2d at 714. The Court concluded that "from the text of the Fourth
Amendment and from the historical and contemporary understanding of its purposes, that an
individual has no legitimate expectation that open fields will remain free from warrantless intrusion
by government officers." Id. at 225-26.

 Appellant failed to present any evidence during the suppression hearing to
demonstrate that the monitoring of her vehicle implicated a reasonable expectation of privacy. The
evidence at the hearing showed that the rural ranch property in question falls squarely within the
definition of "open fields" in which appellant is not entitled to an expectation of privacy. That the
property was fenced and gated does not create an expectation of privacy that society recognizes as
legitimate and reasonable. See Oliver, 466 U.S. at 178; Westfall, 10 S.W.3d at 90; Carroll,
911 S.W.2d at 218; Rosalez, 875 S.W.2d at 719.

 The trial court's ruling on appellant's motion to suppress is supported by the record
and is correct on a theory of law applicable to the case. Accordingly, finding no misapplication of
the law to the facts by the trial court, we hold that the trial court did not abuse its discretion in
denying appellant's motion to suppress. (16)


CONCLUSION


 Because the AFOSI agents had an independent military purpose for their
investigation, they did not violate the Posse Comitatus Act and were authorized to and did comply
with their rules and regulations to install and monitor the tracking device. The record does not show
that the trial court abused its discretion in determining that the police did not violate appellant's
reasonable expectation of privacy by monitoring the tracking device on Sheen's property and the
evidence obtained through use of the device was properly admitted. Having overruled appellant's
sole issue, we affirm the trial court's order denying appellant's motion to suppress and the judgments
of conviction.



 __________________________________________

 Jan P. Patterson, Justice

Before Justices Patterson, Puryear and Pemberton

Affirmed

Filed: March 13, 2008

Publish
1. The extent and source of information about computer searches conducted at the clinic is
not made clear in the record. Palmer testified: "Basically also we discussed there was some
computer inquiries done by her, we discussed that, in reference to a polygraph, and then
decomposition of a body in water, and then ultimately we discussed the ranch and then a pond
located on that ranch."
2. An issue that contains more than one specific ground of error is a multifarious issue,
and we may refuse to consider it. See, e.g., In re Guardianship of Moon, 216 S.W.3d 506,
508 (Tex. App.--Texarkana 2007, no pet.); Sparkman v. State, 55 S.W.3d 625, 630-31
(Tex. App.--San Antonio 2000, no pet.); Marcum v. State, 983 S.W.2d 762, 767 n.1
(Tex. App.--Houston [14th Dist.] 1998, pet. ref'd). We may consider multifarious issues if we can
determine, with reasonable certainty, the alleged error about which the complaint is made. McCain
v. State, 995 S.W.2d 229, 243 n.7 (Tex. App.--Houston [14th Dist.] 1999, pet. ref'd). Although
appellant's issue is multifarious, we will review her arguments in the interest of justice as we are
able to determine the errors about which she complains.
3. Article 85 of the Uniform Code of Military Justice provides for punishment for the offense
of desertion:


 (a) Any member of the armed forces who--


 (1) without authority goes or remains absent from his unit, organization,
or place of duty with intent to remain away therefrom permanently;



 (2) quits his unit, organization, or place of duty with intent to avoid
hazardous duty or to shirk important service . . . 


 is guilty of desertion.


* * *



 (c) Any person found guilty of desertion or attempt to desert shall be punished
. . . as a court martial shall direct.


10 U.S.C. § 885 (1998).
4. There is also evidence that appellant reported her husband missing to the San Angelo
Police Department, also alleging that there was some money stolen from appellant's veterinary
clinic.
5. To the extent appellant now challenges the rules or regulations pursuant to which the
agents sought approval, this issue is waived as it was not presented in the court below. In addition,
appellant does not challenge the authority of the AFOSI agents to install the device on appellant's
vehicle except to the extent they failed to seek the approval of a state district court.
6. Although appellant argued at the hearing that Colonel Hagerty does not have the authority
of a base commander who does have "magistrate status," she adduced no evidence to that effect. It
would follow from this argument that appellant acknowledges that some military authority has the
authority to grant the request.
7. Instead, section 16.06 of the Texas Penal Code provides the available remedy by allowing
prosecution when a "person knowingly installs an electronic or mechanical tracking device on a
motor vehicle owned or leased by another person." Tex. Penal Code Ann. § 16.06 (West 2003). It
also specifies affirmative defenses, including a defense for a peace officer who installed the device
in the course of his law enforcement duties. Id. § 16.06(d).
8. Because article 18.21 does not apply to the AFOSI agents in this case, we need not reach
whether failure to utilize the process provided by article 18.21, section 14 is itself a violation of
article 18.21. See Tex. Code Crim. Proc. Ann. art. 18.21, § 14 (West Supp. 2007).
9. Likewise, commentators have observed: "If a showing were made that Texas law
enforcement officers solicited action by federal or other officers that would violate Texas 'law' if
taken by the Texas officers, the action of those other officers might well be regarded as that of the
soliciting Texas officers. Thus it would probably be tested under Texas law--including Chapter 18
of the Code--and if it is found to violate that law, the products would most likely be inadmissible
under article 38.23." 40 George E. Dix & Robert O. Dawson, Texas Practice: Criminal Practice
and Procedure § 4.68 n.7 (2d ed. 2001).
10. Appellant does not distinguish between the monitoring of various tracking devices, such
as "beepers" and GPS devices, and we therefore need not address any similarities or differences
between them for the purposes of our discussion here.
11. In a single sentence of her brief, appellant argues that section 16.06 of the penal code
"makes it a Class A misdemeanor to unlawfully install such a device upon another's vehicle." To
the extent this sentence can be construed to argue that a violation of section 16.06 has occurred, we
consider this claim waived by appellant's failure to properly brief it. See Tex. R. App. P. 38.1.
12. Appellant does not argue that Article I, Section 9 of the Texas Constitution offers greater
protection to the individual than the Fourth Amendment of the United States Constitution. See, e.g.,
Westfall v. State, 10 S.W.3d 85, 88 (Tex. App.--Waco 1999, no pet.). We will therefore address
these claims together. See Hulit v. State, 982 S.W.2d 431, 436 (Tex. Crim. App. 1998); Heitman
v. State, 815 S.W.2d 681, 690 (Tex. Crim. App. 1991).
13. She states, "Appellant acknowledges that the United States Supreme Court has held that
monitoring of mobile tracking devices does not implicate the Fourth Amendment when a citizen's
movements are monitored in public places and on public roadways." Because there is no expectation
of privacy when traveling in an automobile on public thoroughfares to the entrance of the Sheen
property, we hold that the trial court properly concluded that the tracking of appellant's vehicle to
the location of the Sheen property did not violate state or federal constitutional provisions. See
United States v. Knotts, 460 U.S. 276, 281-82 (1983).
14. Texas courts have upheld the application of the "open fields" doctrine. See Carroll
v. State, 911 S.W.2d 210, 217 (Tex. App.--Austin 1995, no pet.); Beasley v. State, 683 S.W.2d 132,
133 (Tex. App.--Eastland 1984, pet. ref'd); see also Leal v. State, 736 S.W.2d 907, 909
(Tex. App.--Corpus Christi 1987), pet. dism'd, 773 S.W.2d 296 (Tex. Crim. App. 1989).
15. The Fourth Amendment does protect the curtilage of a home. See United States v. Dunn,
480 U.S. 294, 300 (1987).
16. The State argued alternatively at the suppression hearing, and the trial court found, that
even if the installation and monitoring of appellant's vehicle violated appellant's rights, there was
adequate attenuation to preclude the exclusion of evidence. Because we have concluded there was
no violation of appellant's constitutional or statutory rights, we need not reach the question of
attenuation.